

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 17-42053 |
| | § | |
| CAROL ALISON RAMSAY ROSE, | § | CHAPTER 11 |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| CAROL ROSE | § | |
| AND CAROL ROSE, INC., | § | |
| | § | |
| Plaintiffs/Counter-Defendants, | § | |
| | § | |
| VS. | § | ADV. PROC. NO. 17-4104 |
| | § | |
| LORI AARON, PHILLIP AARON, | § | |
| AARON RANCH, AND | § | |
| JAY MCLAUGHLIN | § | |
| | § | |
| Defendants/Counter-Plaintiffs. | § | |
| | § | |
| | § | |
| EQUIS EQUINE, LLC AND | § | |
| ELIZABETH WESTON, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | ADV. PROC. NO. 17-4131 |
| | § | |
| CAROL ALISON RAMSAY ROSE, | § | |
| CAROL ROSE, INC., LORI AARON, | § | |
| PHILLIP AARON, AARON RANCH, | § | |
| AND AARON'S RANCH, INC., | § | |
| | § | |
| Defendants. | § | |

## **MEMORANDUM OPINION (Amended)**

The Court conducted a trial of the disputes between the parties over nine days during May

and June 2018.  Although the disputes arise from two different bankruptcy cases, several different

contested matters, and multiple adversary proceedings, and each of the parties raise distinct claims,

the Court tried the disputes together due to significant shared facts. The Court issues this consolidated opinion for the same reason. The Court exercises its core jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(b)(2).[1] This memorandum opinion embodies the Court's findings of fact and conclusions of law. *See* FED. R. BANKR. P. 7052.

## I. SUMMARY OF THE PARTIES' DISPUTES

The disputes between the parties arise from events that occurred in 2013. The disputes led to several lawsuits and counterclaims in Texas state court. In September 2017, with the litigation still ongoing, Carol Rose ("Rose") and Carol Rose, Inc. ("Rose, Inc.") filed for bankruptcy.

On October 25, 2017, Rose and Rose, Inc. (collectively with Rose, the "Rose Parties") removed pre-petition litigation styled as *Carol Rose and Carol Rose, Inc. v. Lori Aaron, Phillip Aaron, Aaron Ranch, and Jay McLaughlin*, in the 235th Judicial District Court in Cooke County, Texas, Cause No. 13-00535, and commenced Adversary Proceeding No. 17-4104 (the "Aaron Action"). The Aaron Action centers on a dispute between the Rose Parties and Lori Aaron, Phillip Aaron, Aaron Ranch (collectively, the "Aaron Parties" or the "Aarons") and Jay McLaughlin ("McLaughlin") arising out of various agreements. These agreements include the (i) Confidential Term Sheet, (ii) Lease, (iii) Consulting Agreement, (iv) sale catalog for the Carol Rose Quarter Horse preview and dispersal sale of horses, tack and equipment held on August 15, 16, and 17, 2013, and (v) Buyer's Registration and Sale Condition Agreement along with Acknowledgements of Purchase along with Bills of Sale. The agreements concern (i) certain quarter horses that Rose sold to the Aarons, (ii) the Aarons' lease of real and personal property

---

[1] The Rose Parties and the Weston Parties state in the joint pre-trial order that they consent to this Court's jurisdiction over the matters tried by this Court. In addition, on February 27, 2018, the Rose Parties, the Weston Parties and McLaughlin filed a "Joint Notice of Matters for Determination by this Court," which specified the matters that would be determined at trial.

owned by the Rose Parties, (iii) consulting services to be provided by Rose, and (iv) the Aarons' purchase of certain tack and equipment at the dispersal sale.

The Rose Parties also removed pre-petition litigation brought by Elizabeth Weston ("Weston") and Equis Equine, LLC ("Equis Equine" and, collectively with Weston, the "Weston Parties") in the 235th Judicial District Court in Cooke County, Texas, which action was removed to this court as Adversary Proceeding No. 17-4125.  On December 19, 2017, the Weston Parties filed their objection to the dischargeability of the alleged indebtedness owed by the Rose Parties and initiated Adversary Proceeding No. 17-4131.  The Weston Parties' dischargeability complaint centers on the alleged misconduct of Rose and the Aarons in connection with the dispersal sale. On January 10, 2018, the Weston Parties amended the December 19, 2017 dischargeability complaint to include (1) equitable subordination claims, (2) a claim for declaratory judgment on the proofs of claims that the Weston Parties filed in the Rose Parties' bankruptcy cases, and (3) a claim for entry of judgment on non-debtor state-law claims (collectively, the "Weston Action").

The Weston Parties, the Aaron Parties and McLaughlin filed proofs of claim in the bankruptcy cases.  Their claims are based on the state court litigation, which the Rose Parties removed to this Court.  The Rose parties objected to the allowance of the claims, and the Court tried the claim objections together with the associated adversary proceedings.

## II. FINDINGS OF FACT

### A.    The Gainesville Ranch

1.    Carol Rose has been in the equine industry for over fifty years and has specialized in breeding, training and showing performance quarter horses.  She advertises her horses as champions that have won nearly every major competition event.

2.      Rose is the president and sole owner of Rose, Inc., which owns a large piece of real property and improvements located at 4500 I-35 North, Gainesville, Texas 76240 (the "Gainesville Ranch").  Rose does business as Carol Rose Quarter Horses.

3.      Since 1968, Rose has conducted her horse operations at the Gainesville Ranch. There are two homes on the Gainesville Ranch, including Rose's home, several mobile homes, and several large horse barns.  Rose's business office is attached to her home.

4.      Rose breeds quarter horses using stallions and recipient mares (sometimes referred to in the testimony as "recips") on the Gainesville Ranch.  Rose raises some of the offspring and trains them to participate in competitions where they can earn prizes.  Rose breeds and trains horses to compete in all the Western-style disciplines, including the cutting, reined, and reined cow horse disciplines.

5.      SHINING SPARK was one of the stallions raised by Rose.  SHINING SPARK won many competitions in the early 1990s.  SHINING SPARK retired in 1994, and he was eventually inducted into the National Reining Horse Association Hall of Fame.

6.      SHINING SPARK was integral to Rose's breeding program.  As SHINING SPARK aged, his fertility declined.  In 2000, a veterinarian named Dr. Dickson Varner helped Rose to address SHINING SPARK's fertility issues so that she could continue producing offspring from the stallion.  Thereafter, Rose maintained a working relationship with Dr. Varner.

7.      SHINING SPARK produced two stallions that are relevant to these proceedings: A SHINER NAMED SIOUX and SHINERS LENA DOC.  A SHINER NAMED SIOUX and SHINERS LENA DOC are full-blood siblings.  SHINERS LENA DOC is eight years older than A SHINER NAMED SIOUX and was injured as a five-year-old in competition.

4

8.      During the relevant time period, Rose charged fees to people who wanted to breed their mares to one of her stallions.  Rose also earned income when one of her horses won a competition.  In addition, Rose sold some of the offspring of her breeding program through "private treaty" sales, that is, directly to prospective buyers.

9.      Rose allowed people to board horses at the Gainesville Ranch for a monthly fee. The amount varied depending on the age, sex, and needs of the horse.  Rose charged additional fees for her employees to train and ride the boarded horses.  Rose also offered training to owners who wanted to ride their horses in competitions.

10.     Rose defrayed expenses by "partnering" with others on some of her horses.  Her partners shared an ownership interest with Rose in particular horses.  Rose also defrayed expenses by bartering with service providers.  She offered free boarding for horses as well as a limited number of free breedings with her stallions to some of her service providers.

11.     Rose employed a small staff to help her run the Gainesville Ranch, including a head horse trainer and several assistant horse trainers.  Many of the employees lived on the Gainesville Ranch, and several had worked for Rose for many years.

12.     Jay McLaughlin came to work for Rose beginning on January 1, 2009.  McLaughlin has trained and shown performance horses since he graduated from high school in 1993.

13.     Rose employed McLaughlin as her head horse trainer.  He primarily rode and trained the performance quarter horses that were three-years-old and up.  In addition to his salary, Rose paid McLaughlin one-third of any winnings when he showed a horse in a competition as well as a commission on the sale of horses that were two-years-old and up.

14.     Rose controlled every aspect of managing and running the daily operations of the Gainesville Ranch as well as horse sales and breedings.  She was a difficult employer.  She sometimes berated her horse trainers, including McLaughlin, in front of clients.

15.     Rose was less involved in the financial aspects of managing and running the Gainesville Ranch.  Rose testified, credibly, that she is not an "office person."  She relied on others to keep the books and records for her business.  Rose employed Nelle Murphy as her office manager during the relevant time period, and Eleise Blake provided Rose with bookkeeping services on a contract basis.

16.     Blake had worked with Rose since 1995 and considered her a personal friend.  In addition to showing her own performance quarter horses, Blake owned an accounting business.  She kept a general ledger for daily transactions for Carol Rose Quarter Horses and sometimes used the business bank account to pay some of the bills for Carol Rose Quarter Horses.  Blake used a proprietary software system to generate invoices for Rose to bill customers.

17.     Victor Clark, who is a Certified Public Accountant ("CPA"), provided accounting services to Rose's business.  Clark had worked with Rose since 1978 and was her business partner on some horses.  He also provided equine appraisal services to Rose.  Clark lives in Ohio and has worked for Campbell-Rose, CPAs since he graduated from college.

**B.     Rose's Financial Problems**

18.     Rose testified that her business, especially the breeding and sales parts of her business, ebbs and flows with the economy.  In December 2006, Rose and Rose, Inc. obtained a $1.5 million loan from Texas Star Bank.  The loan was secured by the Gainesville Ranch as well as Rose's personal guaranty.

19.     Rose began experiencing severe cash flow problems after the financial crises of 2007-2008.  The Gainesville Ranch cost more than $200,000 to operate each month.  Carol Rose Quarter Horses  was not generating enough income to pay all of its ongoing expenses – despite the high prices Rose commanded for her horses and breedings.

20.     The Gainesville Ranch originally consisted of 653 acres.  In or around 2009, Rose sold 200 acres to a neighbor.  Rose also entered into an agreement granting the neighbor a right of first refusal with respect to the purchase of the remainder of the Gainesville Ranch.  The Agreement Regarding Rights to Purchase Real Estate dated July 22, 2009, was filed in the real property records for Cooke County, Texas.

21.     Rose borrowed money from several of her long-time friends to fund the operations of the Gainesville Ranch.  For example, Rose called a friend, Paul Violich, and asked for help in the fall of 2011.  He loaned her $400,000.00.  Rose also incurred a debt of $82,000 to Victor Clark at some point.

22.     Rose occasionally asked McLaughlin to forego his monthly salary so that she could use the funds to pay the other employees.

23.     Despite her efforts, Rose was unable to pay all of the employment taxes for her business, and the Internal Revenue Service filed a federal tax lien against Rose, Inc. in June 2012.

24.     In 2012, Rose engaged the services of Lewis Stevens to defend her in connection with a lawsuit brought by a veterinarian seeking to collect unpaid bills.  Stevens is a Fort Worth attorney who holds himself out as a specialist in equine law.  In addition to his law practice, Stevens raises and shows "cutting" horses (which are horses trained in separating cattle from a herd), and he had his own breeding operation for many years.

25.     At or around the time the IRS filed the federal tax lien, Rose decided to hold a "production sale" at the Gainesville Ranch, that is, an auction of the produce of her mares and stallions.  Rose had previously conducted several auctions at the Gainesville Ranch over the years.

26.     Rose created and distributed a sale catalog advertising that 50 horses would be offered for sale at an auction on October 12, 2012.  Rose intended to sell both her own horses and horses owned by others at the production sale.  In the production sale catalog, Rose disclosed the actual owners when Rose was acting as an agent.  Rose testified that the auction was conducted with a reserve, which means that Rose established minimum prices that she would accept as the winning bid for each horse.

27.     Rose made approximately $1 million from the production sale.  Rose used the proceeds to pay off the $320,000 federal tax lien as well as other debts relating to the operation of the Gainesville Ranch.

28.     Rose reported to news outlets that all of her horses sold at the production sale. However, not all of the horses actually sold.  For example, Rose reported to the quarter horse industry that a yearling filly named SUE'S PRETTY GIRL sold for $11,500, but Rose testified at trial that the bids for that horse failed to beat her reserve price that day.

29.     At some point prior to February 2013, Rose sold an additional 200 acres of the Gainesville Ranch to her neighbor for approximately $1.4 million.  Over one-third of Carol Rose Quarter Horses' gross income during the March 2012 to February 2013 fiscal year was derived from this one-time sale of real estate.

30.     Rose continued to struggle to pay the monthly operating expenses for Carol Rose Quarter Horses.  In late March, Rose obtained a $50,000 loan from Texas Star Bank.  Victor Clark provided his opinion of the value of the 15 horses that would secure the loan, estimating their value

to be $2,935,000.  The horses offered as collateral included SHINER NAMED SUE, SHINERS LENA DOC, and SHINING STUFF.  Texas Star Bank took possession of the original registration certificates for the 15 horses to hold until the loan was paid in full.

31.    By early April 2013, Rose had decided to get out of the horse business.  She contacted her neighbor to see if he had any interest in buying the remainder of the Gainesville Ranch and some of her horses.  Her neighbor declined.

32.    The mortgage to Texas Star Bank matured on April 10, 2013.  Rose obtained a renewal, modification and extension of the loan.  The balance at that time was $1,146,850.82.  The mortgage was due to be paid in full by September 10, 2013.

33.    In early April 2013, Rose began advertising that she would auction her stallions, broodmares and prospects as well as her tack and equipment at a "complete dispersal sale" to be held at the Gainesville Ranch on August 15, 16 and 17, 2013.  She advertised that she would "keep only one broodmare and a few select show horses for her personal use."

34.    A dispersal sale typically attracts more buyers than a production sale in which the seller is "reserving" the right to bid.  According to the Aaron's expert witness, Mike Brandly, the term "complete dispersal" is significant in conveying certain material facts about an auction to the public.  Specifically, the term is used to imply a "without reserve" auction.  According to Mr. Brandly, this is important because individuals familiar with auctions know that when a seller sells "without reserve," the items being auctioned (here, horses and equipment) must sell for whatever bid is placed, even if the bid is severely below market.

35.    On April 22, 2013, Rose obtained a $500,000 line of credit from Texas Star Bank.  The line of credit was secured by Rose's equipment and several of her horses, including A SHINER NAMED SIOUX and SHINERS LENA DOC.  Rose immediately paid off the prior $50,000 loan,

paid off an overdraft of approximately $100,000, and received an advance of $162,500. The loan agreement recites the parties' understanding that the proceeds of the dispersal sale would be used to pay any and all outstanding indebtedness owed by Rose and Rose, Inc. to Texas Star Bank.

36.    Rose failed to repay the $400,000 loan from Mr. Violich when it came due. He sued her on April 18, 2013, in Cooke County, Texas. On June 18, 2013, the state court entered judgment for Mr. Violich against Rose for $411,530.64.

### C.    Rose Meets the Aarons

37.    Lori and Phillip Aaron owned a ranch called "Aaron Ranch" in Commerce, Texas, and operated a website which promoted the ranch and their breeding operations.[2] The Aarons bred and raised horses at their ranch. Prior to meeting Rose, the Aarons published materials advertising their horse breeding and sales operation at their Commerce, Texas facility.

38.    In contrast to Rose, the Aarons had no personal experience breeding or showing performance quarter horses.

39.    Phillip Aaron did not personally know Carol Rose, but he knew of her by reputation. He had watched her on television and thought she was as good a horse person as he had ever seen.

40.    In the spring of 2013, Lori Aaron contacted Rose about purchasing a horse. She and her husband, Phillip Aaron, visited the Gainesville Ranch and looked at several horses. In June 2013, after the Aarons made a second trip to the Gainesville Ranch, Rose sold them three horses, namely BLINDSIDED, SHINERS PLAYWRIGHT, and SHINING STUFF, for a total price of $475,000.00.

---

[2] The Aaron Ranch is a partnership between the Aarons. In addition, the Aarons own an entity called Broken Arrow Cattle Company, LLP. Lori Aaron testified that Broken Arrow Cattle Company pre-dates the Aaron Ranch by many years.

41.    McLaughlin first met the Aarons when they came to look at horses.  He showed some horses to the Aarons in an arena on the Gainesville Ranch.  Rose answered all of their questions while McLaughlin worked with the horses in the arena.

42.    The Aarons were unaware that Rose had begun advertising a dispersal sale. However, during their discussions, Rose explained to the Aarons that she was ready to slow down professionally and disperse her prize-winning assets.  She offered to sell the Gainesville Ranch and all of her horses to the Aarons for $20 million.

43.    In the spring of 2013, Lori Aaron was looking to invest in a business in which her family could participate.  Although the Aarons liked the location of the Gainesville Ranch and some of Rose's horses, they did not accept her offer to purchase the entire operation for $20 million.

44.    The discussions turned to a different type of arrangement.  The discussions were primarily conducted by Lori Aaron and Rose.

45.    Phillip Aaron testified, credibly, that he advised his wife against entering into a business arrangement with Rose, but he was "outvoted" by his wife and children.  He viewed this venture as his wife's business, and his involvement in the negotiations was limited.

46.    Rose offered to sell the Aarons a large number of horses, lease the Gainesville Ranch to them, and provide her services as a consultant.  Rose told the Aarons that this was a way to keep together most of the so-called "quality" horses as well as her existing facilities that she had spent years assembling to create an on-going business.  Rose and the Aarons agreed that the new business would operate under the Aaron Ranch name so that the Aarons could take her place in the performance quarter horse industry.

11

47.     Rose's attorney, Lewis Stevens, became involved in the negotiations at the end of May 2013.  Lori Aaron was his primary point of contact.  He provided financial information to the Aarons, including schedules of the assets of Carol Rose Quarter Horses and a Profit and Loss Statement for Carol Rose Quarter Horses' March 2012 to February 2013 fiscal year.

48.     Rose's bookkeeper, Eleise Bank, had originally provided the Profit and Loss Statement to Victor Clark.  Her version separated the income from the horse business and the income derived from the one-time sale of real estate.  Clark collapsed the income from the horse business and sale of real estate into one line.

49.     On May 30, 2013, Lewis Stevens sent Clark's version of the Profit and Loss Statement to the Aarons.  Instead of an operating loss of approximately $1.2 million, the Profit and Loss Statement provided to the Aarons showed an operating profit of approximately $200,000. The fact that over $1.4 million of Carol Rose Quarter Horses' gross income for the March 2012 to February 2013 fiscal year came from the sale of real estate instead of horses was not disclosed to the Aarons, nor was it evident from the truncated spreadsheets produced to them by Stevens.

50.     In the cover letter that attached the Profit and Loss Statement, Stevens stated: "The numbers can be updated, but this period captures the 2012 breeding season as well as a year of activity.  You will see the business generated roughly $494,000 of net operating income and $186,000 of net income after interest expense."  Stevens also pointed out in his cover letter that the total employee and wage expense was $370,000 for the year.

51.     Lori Aaron responded the same day.  She explained that she had been "studying the numbers," and she asked Stevens how Rose had arrived at $20 million for the value of the entire operation.  Stevens responded that the value of the real property was a "missing piece" not included in the Profit and Loss Statement.

52.     Rose's CPA, Victor Clark, met with the Aarons at the beginning of June 2013 at Rose's request.  Lori Aaron understood Clark to be an equine appraiser as well as a CPA.  As previously discussed, Clark had provided his opinion as to the value of Rose's horses in connection with some of the loans Rose obtained from Texas Star Bank.

53.     Stevens, Clark, Rose and the Aarons met again at the end of June 2013.  At or around the time of this meeting, the Aarons generally agreed to purchase a large number of horses from Rose, lease the Gainesville Ranch, and retain Rose's services as a consultant.  Clark testified that he advised Rose and the Aarons that the public would not think much of them if the horses the Aarons planned to buy were not offered for auction at the upcoming dispersal sale.

54.     Rose selected the horses she believed the Aarons should purchase, and Rose set prices for the horses.  The Aarons did not seek an independent appraisal.

55.     Rose proposed to the Aarons that they should keep her employees.  In Rose's communications with Lori Aaron, her descriptions of her employees were positive and complimentary.  She advised the Aarons that many of her employees, including McLaughlin, were due for raises.

56.     Rose suggested to McLaughlin that perhaps he could be a trainer for the Aarons after they took over operations.

57.     McLaughlin did not tell the Aarons they were paying too much for any of the horses.  McLaughlin testified that he had never ridden a $150,000 horse until he came to work for Rose and that Carol Rose Quarter Horses was a "different world."  He had frequently seen Rose ask hundreds of thousands of dollars for her horses and get it.

58.     In July 2013, the Aarons met with Rose and McLaughlin in a limousine owned by the Aarons.  They were all attending a horse show in Stephenville, Texas.  McLaughlin did not

want to attend the meeting because he "needed to be down at the barn doing something." McLaughlin testified, credibly, that he said very little because he had "learned to keep [his] mouth shut" around Rose unless asked a direct question. Phillip Aaron likewise testified, credibly, that "the women did the talking and we did the bobbing head job."

59.     During the meeting in Stephenville, Rose and Lori Aaron discussed a mare called SHINERS LADY LUCK. The mare was not one that Rose had planned to sell to the Aarons, but she performed well at that show.

60.     The Aarons also met with Eleise Blake during the horse show in Stephenville. Blake described the accounting services she provided to Rose, including the specialized software she used for invoicing ranch customers. Lori Aaron responded that she would not need such software, because she did not intend to board anyone's horses at the Gainesville Ranch.

61.     As the discussions between Rose and the Aarons progressed, Rose's attorney, Lewis Stevens, drafted a Confidential Term Sheet, Consulting Agreement, and Lease with Purchase Option (collectively, the "Agreements"). He dealt directly with the Aarons, primarily Lori Aaron, during the initial negotiations. Stevens assured the Aarons that their pre-auction purchase agreement with Rose was legal, ethical, and common in the horse industry.

62.     Lori Aaron retained an attorney, Sheppard Sands, to review the documents Stevens had drafted. She asked Sands to ensure that the documents captured the Aarons' understanding of their deal with Rose.

63.     The Aarons, the Aarons' bookkeeper, Rose, Stevens, Sands, and another attorney from Sands' office attended a meeting on July 24, 2013. After a "meet and greet," Sands (and Sands' law partner), Stevens, and Phillip Aaron broke out into a separate meeting.

14

64.     Sands does not hold himself out as an expert in equine law.  Stevens, who does, assured Sands and Phillip Aaron that the arrangement set forth in the Confidential Term Sheet was common in the horse business.  Stevens' testimony that he did not provide such assurances to Sands and the Aarons was not credible.

### D.     Rose and the Aarons Execute the Agreements

65.     Carol Rose, Carol Rose, Inc., Lori Aaron, Phillip Aaron, and the Aaron Ranch executed the Confidential Term Sheet on August 6, 2013 – ten days before the horses were to be offered for auction at Rose's dispersal sale. Rose requested that the term sheet be kept confidential. Rose testified that she did not want other bidders at the auction to know about the arrangement because they would likely be "upset" about her pre-auction agreement to sell 39 of the 144 horses to the Aarons.

66.     The Confidential Term Sheet contained two lists of horses.  Exhibit A-1 to the Confidential Term Sheet is sometimes referred to as the Blue List Horses (the "Blue List Horses") and Exhibit A-2 to the Confidential Term Sheet is sometimes referred to as the Red List Horses (the "Red List Horses").

67.     The first list, commonly referred to as the Blue List, identified 39 horses (plus embryos and foals).  Based on their discussions with Rose, the Aarons believed that the Blue List Horses were essential to the continued success of the business.  The total price that the Aarons agreed to pay for the Blue List Horses was $3,315,000.00.

68.     The Blue List included a palomino stallion named A SHINER NAMED SIOUX for $750,000 and his full-blood brother, SHINERS LENA DOC, for $150,000.  Although Rose did not believe the Aarons needed SHINERS LENA DOC for their breeding operation, Lori Aaron wanted to include both stallions on the Blue List.

15

69.     The Blue List also included a sorrel mare, ROOSTERS CUTE WILSON, for $50,000.  Victor Clark owned ROOSTERS CUTE WILSON.

70.     The Confidential Term Sheet required the Aarons to bid on the Blue List Horses at the upcoming auction.  Paragraph 1 of the Confidential Term Sheet provided as follows:

> Aaron shall purchase the horses identified in Exhibit A-1 ("Horses Sold") for the prices specified thereon.  Rose and Aaron understand that these horses will pass through the Dispersal Sale Auction scheduled for August 16, 2013.  The applicable American Quarter Horse Association ("AQHA") registration certificate and transfer report will be provided to Aaron at the price identified on Exhibit A-1, if Aaron is the last bidder.

71.     The second list, commonly referred to as the Red List, identified 15 additional horses (plus embryos and foals).  With respect to the Red List Horses, the Confidential Term Sheet provided as follows:

> Aaron shall have the opportunity to bid on other horses at the Dispersal Sale Auction.  A schedule of horses for particular consideration is attached as Exhibit A-2 ("Horses to Consider").

72.     The Aarons were not obligated to purchase or bid on any of the Red List Horses. Instead, the Red List merely identified horses that Rose thought would be "good buys" if the Aarons were able to purchase them at or around the prices set forth on the Red List.  If the Aarons were the high bidder on any Red List Horse during the August 16, 2013 auction of the horses at the dispersal sale, they would be required to pay the hammer price.

73.     The Red List included the mare named SHINERS LADY LUCK for a suggested price of $125,000.  The Red List also included a colt named REYS A SHINE for a suggested price of $90,000 and a colt named SUSHI BOSS for a suggested price of $100,000.

74.     The Confidential Term Sheet contemplated a separate consulting agreement that would include a non-compete provision allowing Rose to sell and promote a limited number of personal horses.  The Confidential Term Sheet provided Rose with "lifetime annual breedings" to

A SHINER NAMED SIOUX (two breedings per year), BLINDSIDED (two breedings per year), and SHINERS LENA DOC (one breeding per year).  In addition, the Confidential Term Sheet provided the Aarons with the right to obtain three embryos from SHINERS LIL ANN, one embryo per year, beginning in the breeding year of 2014 and continuing for 2015 and 2016.

75.     As part of the deal with the Aarons, Carol Rose and Carol Rose, Inc. also entered into a five year Lease With Purchase Option (the "Lease") for the Ranch and equine facilities with the Aarons.  In addition, Rose entered into a Consulting Agreement in which she promised that she would commit her skill, background, and expertise in consulting with Aaron Ranch to manage its equine operations for five (5) years in order to achieve the "desired outcome of the Agreement" (growth of the Ranch's [Aaron Ranch] marketability and presence in the Equine Business), and promised not to engage in substantial competition with Aaron Ranch's equine operations through the sale or promotion of her own horses.

76.     More particularly, the Consulting Agreement provided that Rose "consult on and supervise" all areas of the Aarons' horse training, breeding, board, and sales business, including (1) the training of horses; (2) the showing of horses; (3) the sale of horses; (4) the general care of the Aarons' horses, including "the use and contracting with third parties for the provision of veterinarian, farrier, training and other services"; and (5) the general care and upkeep of the Gainesville Ranch.  In return, the Aarons agreed that Rose would have continued use of her personal residence, use of the office, training and board for up to four horses at no charge, boarding for an additional three brood mares at no charge, use of the Aarons' vehicles, and a 10% commission on the sale by Rose of any horses the Aarons owned.

77.     The Lease required the Aarons to make monthly payments to Rose in the amount of $41,666.67 on the 30th of each month for five years (*i.e.* $500,000/year) beginning August 30,

2013.  August 30, 2013, was the final day of the inspection period wherein the Aarons could terminate the Lease.

78.     Lori Aaron testified that she did not agree to pay $3,315,000.00 for just a group of horses.  She testified that she never would have bought the Blue List Horses without the "package deal," including the Lease and Consulting Agreement.

79.     Within a day of signing the Agreements, a dispute arose between Rose and the Aarons.  Rose told Lori Aaron that Phillip had promised to give Rose's bookkeeper, Eleise Blake, a breeding to A SHINER NAMED SIOUX.  Phillip Aaron testified, credibly, that he had never spoken with Eleise Blake or promised a breeding to anyone.

80.     While the Confidential Term Sheet does not say when the Aarons had to pay for the Blue List Horses, Rose understood that they would pay the full amount due under the Confidential Term Sheet on August 7, 2013.  Lori Aaron exchanged messages with Rose and Lewis Stevens that day, explaining that she was $1 million short in available cash.  Rose was upset that the Aarons did not intend to pay the full amount on August 7th, and she exchanged heated messages with Lori Aaron.  Rose suggested removing the two stallions (A SHINER NAMED SIOUX and SHINER's LENA DOC), which she valued at nearly $1 million, from the Blue List.

81.     The Aarons wired approximately $2.3 million to Rose on August 8, 2013.  The Aarons wired the balance due for the Blue List Horses on August 9, 2013.

82.     According to the Confidential Term Sheet, the Aarons were still required to be the final bidder at the auction in order to obtain the registration certificates for the Blue List Horses. All the parties understood that the Blue List Horses would have little value to the Aarons without the registration certificates.  The Confidential Term Sheet also provided that, regardless of the

"hammer price" at the auction, as long as the Aaron Parties were the final bidder, they would be required to pay the price listed in the Confidential Term Sheet for the Blue List Horses.

83.     During July and August, the Aarons interviewed some of Rose's employees and service providers, including McLaughlin.  They invited McLaughlin to continue in his position as the head horse trainer at the Gainesville Ranch, which would become the Aaron Ranch.  McLaughlin accepted.

84.     The Aarons did not interview Rose's office manager, Nelle Murphy.  Rose hired Nelle Murphy just before the dispersal sale.[3]  The Aarons were on vacation at the time Rose hired Nelle Murphy.

85.     Lori Aaron had intended that her daughter would be the office manager for both the Gainesville Ranch and the Aarons' ranch in Commerce, Texas.  Lori Aaron had discussed her plan with Rose, but Rose hired Nelle Murphy without consulting her.  Rose also did not inform Lori Aaron that she intended to move a trailer onto the Gainesville Ranch where Nelle Murphy would live or that she would be boarding a horse for Nelle Murphy for no charge.

86.     By the day before the scheduled dispersal sale, Rose had spent approximately $900,000 of the funds the Aarons had wired to her account.  Rose used the funds to pay various debts and obligations relating to Carol Rose Quarter Horses.

87.     At around the time of the dispersal sale, Rose gave raises to many of her employees without the knowledge of the Aarons.  Lori Aaron discovered the raises when she received salary information from Rose for the payroll at the end of August 2013.  Some of the salaries were higher than the payroll information she had received during negotiations with Rose.

---

[3] Judy Hollomon was Rose's office manager at the time the dispersal sale catalog went to press, and her name appears in the catalog as a member of Rose's staff.  Holloman had recently been released from prison for bank fraud.  Prior to her conviction, she had been Rose's bank officer at Texas Star Bank.  Hollomon left Rose's employ at some point prior to the auction.

### E.    The Dispersal Sale Catalog

88.     While she was negotiating with the Aarons, Rose continued to advertise and plan the upcoming dispersal sale.  Rose used her production sale catalog as a template for a dispersal sale catalog.  Her attorney, Lewis Stevens, reviewed the portion of the dispersal sale catalog that contained notices, special notices, and terms and conditions, and he and made minor, stylistic changes.

89.     The dispersal sale catalog reflected that 144 horses (and one steer) were to be auctioned.  Since this was a large auction, each of the horses was listed numerically by "hip number" in the sale catalog.  A sticker with the horse's catalog number would be placed on the horse's hip during the auction.

90.     The dispersal sale catalog included Rose's own horses, 17 horses in which she had a 50% interest, and 23 horses owned by others.

91.     In contrast to her production sale catalog, the dispersal sale catalog did not disclose the true owner when Rose was acting as an agent except as to the last horse in the catalog.  Rose disclosed that the last horse in the catalog, a sorrel filly named YURS N MINE, was owned by herself and another individual.

92.     Rose and Clark frequently communicated about the dispersal sale.  They discussed the pedigrees of the horses and the order in which the horses should be presented in order to maximize value, among other things.

93.     Clark testified that dispersal sales frequently include at least a few horses not owned by the person going out of business.  With respect to his horses, Clark testified that if Rose was getting out of the performance quarter horse business, then so was he, and so he included all of the reining and cow horses he had at the Gainesville Ranch in the auction.

94.     Texas Star Bank held a lien on some of the horses Rose planned to auction at the dispersal sale.  Rose needed to net several million dollars from the dispersal sale in order to pay her debts and the debts of Rose, Inc.

95.     Rose advertised the dispersal sale by publishing the sale catalog online.  The sale catalog identified general information about each horse—*e.g.*, pedigree, performance record, notes, and produce record—as well the tack and equipment included in the sale.

96.     The catalog also contained the terms and conditions of the dispersal sale.  The terms and conditions were listed on pages 14 and 15 of the dispersal sale catalog in a mixture of all caps and small font.  Among other things, the terms and conditions provided that:

- Purchaser shall make payment no later than thirty minutes after the conclusion of the auction.

- THERE IS NO WARRANTY EXPRESS OR IMPLIED BY CAROL ROSE QUARTER HORSES, OWNER OR CONSIGNOR, AS TO ANY CONDITIONS OF ANY HORSES INCLUDING BUT NOT LIMITED TO THE PERFORMANCE SOUNDNESS, MERCHANTABILITY, OR FITNESS FOR ANY PURPOSE OF ANY HORSE OFFERED IN THIS SALE.

- ALL HORSES ARE SOLD "AS IS" WITH ALL EXISTING CONDITIONS AND DEFECTS.

- REGISTRATION PAPERS:  After all accounts are settled, the Registration Papers and a completed Transfer Report will be sent to AQHA for transfer of ownership and mailed to the new owners at the at the address shown on the Acknowledgement of Purchase.  NO registration papers will be released at time of sale—NO EXCEPTIONS.

- Unless waived by announcement, there shall be an upset price of $1000 on any horse entering the sales ring.

- The right to bid is reserved for all consignors unless otherwise announced.

- Purchaser shall be responsible for the care, custody, control and security for the horse and for all expenses relating thereto.

97.     Elizabeth ("Kay") Williams saw an advertisement for the dispersal sale in an industry magazine in April 2013.  After looking at the online sale catalog, she contacted Rose to

ask about two of the horses that Rose planned to auction, including a sorrel filly called MINI HOT FLASHES.

98.     Williams and Rose discussed a possible purchase of the two horses for $30,000 - $50,000 each.  Williams testified that Rose told her that she could sell the horses to Williams in a private sale up until the time she printed the sale catalog for the auction.  Williams left for a lengthy vacation without finalizing a sale.

99.     Williams visited the Gainesville Ranch upon her return from vacation in June 2013 (after the deadline for a copy of the dispersal sale catalog to be sent to a printer).  She discussed the horses with Rose, who told her they had progressed significantly and, therefore, had increased in value.

100.     Due to Rose's fame, the dispersal sale drew interest from many corners of the world.   One of the plaintiffs in this proceeding, Elizabeth Weston, also saw the online advertisements for the dispersal sale.  Weston was in the market for horses her son could use in mounted archery competitions.  Mounted archery is a different discipline than cutting or reining but draws on some of the same equine talents.

101.     Weston contacted her friend and equine advisor, Victor Froschl, and asked him to fly to the United States from his home in Hungary to attend the auction with her.  Weston believed that the "complete dispersal sale" was being conducted "without reserve" based on Rose's marketing materials.

102.     Froschl cancelled a prior engagement in order to attend the dispersal sale with Weston.  Weston paid for Froschl's flight and other expenses.

103.     Froschl was acquainted with Rose but had not seen her for many years.  He and Weston drove to the Gainesville Ranch on August 14, 2013, so that he could visit with Rose if she happened to be there.  Weston waited in the vehicle while Froshl talked with Rose.

104.     Froshl attended the auction preview with Weston the next day, August 15, 2013. It was during this visit that Weston first saw the stallion named SHINERS LENA DOC.  Weston and Froschl had not previously focused on SHINERS LENA DOC as a potential purchase. However, Weston was impressed by the stallion.

### F.     The Complete Dispersal Sale

105.     Rose did not hire an auction company to run the dispersal sale.  Instead, she contacted two auctioneers she had known for many years, Don Green and Harold Brown.  Each auctioneer would be paid a percentage of the gross receipts from the auction.

106.     Rose provided attendees with printed copies of the dispersal sale catalog.

107.     On August 15, 2013, Rose opened the Gainesville Ranch to anyone who wanted to preview the horses that would be auctioned the next day.  Rose offered dinner and, following dinner, a demonstration of the performance horses.  According to Rose, the preview was "packed."

108.     During the preview, attendees had access to Rose's breeding barn, which contained all available health information, including x-rays for two-year olds and older horses and genetic testing results.  In addition, Rose's veterinarian, Dr. Katherine Joos, was on-site and available to answer questions about the horses.  Weston and Froschl attended the preview; the Aarons did not.

109.     The live auction of Rose's horses was scheduled to begin at 9 a.m. on August 16, 2013 at the Gainesville Ranch.  At 5 a.m. on the morning of the auction, Rose met with Brown and

Green, among others, in her conference room.  Rose had prepared 3-ring binders for the auctioneers and the announcer, Joel White.

110.    The binders contained copies of the pages of the dispersal sale catalog that described each horse.  Prior to the meeting, Rose had marked each of the Blue List Horses with an "A" (for Aaron) and wrote the price that the Aarons had paid for each of those horses.  Rose shared with everyone at the meeting that she had deal with the Aarons to sell them the horses marked with an "A" for the prices written in the binders.

111.    Rose also marked the binders with minimum, or reserve, prices for most of the remainder of the horses.  Rose testified that she marked "a few" horses with an "s," which meant sell.

112.    Lewis Stevens assisted Rose with the preparation of a binder for the Aarons.  On the night before the auction, he emailed Lori Aaron that Rose had made a mistake with respect to the hip number for one of the horses.  He told Lori Aaron to "make a note and it will be corrected in the book Phillip uses."

113.    Rose testified that she had never attended an auction without a reserve.  However, her placing of reserve prices on many of her horses was inconsistent with her widely advertised intention to sell everything but a few, personal items at the auction.

114.    Green and Brown were aware that the Aarons would be bidding on their own horses during the auction.  Green and Brown did not know the Aarons and did not meet them prior to the auction.

115.    Green and Brown did not inform any of the registered bidders at the auction that the Aarons had purchased 39 of the horses listed in the dispersal sale catalog prior to the auction or that they would be bidding on their own horses during the auction.

116.     Green testified that "alley trades" are common at horse auctions.  He described an alley trade as a purchase of a horse that occurs in the alley behind the auction barn just before the auction.  The new owner runs the horse through the auction and bids on the horse up to the purchase price.  If a third party tops the new owner's bid, the new owner has the option of selling the horse to the third party.  Alternatively, the new owner can continue topping bids by third parties until the new owner wins the bidding and "catches back" the horse.

117.     Rose's arrangement with the Aarons differed from an alley trade as described by Green.  The Aarons were not simply "catching back" their horses, but were bidding on the Blue List Horses in order to obtain the registration papers from Rose.  The Aarons did not have the option to sell the Blue List Horses to a higher bidder under the terms of the Confidential Term Sheet.

118.     Rose saved a parking space for the Aarons at the auction.  Rose asked her attorney, Stevens, to sit with the Aarons during the auction.

119.     The Aarons arrived late.  McLaughlin testified, credibly, that Rose was nervous when the Aarons had not arrived prior to the scheduled start of the auction.

120.     The Aarons arrived just as the auction was about to begin.  Stevens met the Aarons immediately upon their arrival and handed Phillip Aaron a 3-ring binder.  The binder contained copies of certain pages from the dispersal sale catalog upon which Rose had placed stickers, prices, and instructions for bidding.

121.     The Aarons sat in the front row at the auction.  Phillip Aaron sat between Stevens and his wife with the binder on his lap.  Rose testified that Stevens was supposed to give the Aarons advice if "they got confused," because she "didn't know how much experience the [Aarons] had …."  Stevens charged her his hourly rate for the time he spent with the Aarons at the auction.

25

122.     Like the preview, the auction was well-attended.  There were over 600 registered bidders.  The Buyer's Registration and Sale Conditions Agreement signed by each of the registered bidders incorporated the terms and conditions of the dispersal sale set forth in the catalog.

123.     Rose stood at the front of the room near the auctioneers during the auction.  She did not bid on any of the horses.  She did not inform anyone that the Aarons had already purchased 39 of the horses listed in the dispersal sale catalog or that they would be bidding on the Blue List Horses during the auction.

124.     Neither Green nor Brown disclosed Rose's use of reserve prices to bidders present at the dispersal sale.  In fact, it was represented to the audience by Green, with Brown, Rose, Lewis Stevens and Victor Clark present, that only the last horse in the auction (YURS N MINE (Hip #145)) was sold with a reserve price.

125.     Phillip Aaron is hard of hearing.  He testified, credibly, that it was hard for him to hear what was happening at the auction.  Phillip Aaron also testified, credibly, that his ability to read and write is limited.  He further testified, credibly, that Stevens prompted him, by nudging or elbowing him, when to bid on each of the horses he had pre-purchased.  Weston confirmed that she witnessed Stevens leaning over to talk to Phillip Aaron while he was bidding as well as looking at and pointing to the 3-ring binder.

126.     The testimony of Phillip Aaron and Weston was highly credible.  Stevens' testimony that he attended the auction merely as a social host was not credible.

127.     Rose's confidential arrangement with the Aarons to bid on the Blue List Horses, which the Aarons had already purchased, gave the auction a false appearance of competitive bidding.  To the auction attendees at large, including Weston, the Aarons appeared to be vigorously competing for horses they hoped to purchase and were registering bids that would ultimately set

the purchase price. For the most part, however, the Aarons were bidding on horses they had purchased prior to the auction, and they needed to "win" the horses at auction in order to obtain the registration papers from Rose.

128.    While the Aarons were the "highest bidder" on the Blue List Horses they purchased, the actual purchase prices they paid were the pre-arranged prices set forth in the Confidential Term Sheet – regardless of the amount of the highest bid. For example, the Aarons purchased the mare SMART SHINEY ANNIE and paid $45,000 prior to the auction. But at the auction – where she was the first horse presented – the Aarons had to keep bidding until they were the "highest bidder" at $100,000. As another example (of many presented at trial), the Aarons purchased Rose's premier stud, A SHINER NAMED SIOUX and paid $750,000 prior to the auction. But at the auction, the Aarons had to take the bidding up to $850,000 to be declared the highest bidder.

129.    There were two instances in which the Aarons' "winning bids" for horses on the Blue List were actually lower than the prepaid purchase price. The Aarons did not receive any benefit from the lower hammer prices.

130.    At trial, the Aarons testified that they now believe that the agreement with Rose that required them to bid on the Blue List Horses at the auction was designed specifically to give a false appearance of competitive bidding and artificially inflate the auction horse values as well as deceive the public, the horse industry, and other auction attendees, which included Weston.

131.    The auctioneers also distorted bidding during the auction. Rather than disclose Rose's use of reserves, the auctioneers took fictional bids "off the light fixtures" in order to get to the reserve prices for the horses. They accomplished this by running the price up quickly, leaving the audience puzzled about the source of the bids, while at the same time creating a bidding frenzy.

132.     The only Blue List Horse the Aarons did not "win" at the auction was SHINERS LENA DOC.  SHINERS LENA DOC was the full-blood brother of A SHINER NAMED SIOUX, which garnered the highest bid of $850,000 at the auction.  The Aarons had paid $150,000 for SHINERS LENA DOC pursuant to the terms of the Confidential Term Sheet, but Rose did not include that horse in the auction binder she prepared for them.

133.     When SHINERS LENA DOC was brought out to the sales ring, Lori Aaron prompted Phillip Aaron to bid on him.   Lori Aaron had a copy of Confidential Term Sheet, which attached the Blue List and Red List.  Lori Aaron knew they had paid Rose for SHINERS LENA DOC prior to the auction and needed to "win" him in order to get the registration papers.

134.     When the bidding reached $150,000, Stevens prompted Phillip Aaron to stop, perhaps because SHINERS LENA DOC was not in the auction binder Rose had prepared.  A long pause in the bidding ensued.

135.     The auctioneers then reminded the auction participants that SHINERS LENA DOC was the full-blood brother of SHINER NAMED SIOUX.  Weston testified that the $850,000 winning bid on SHINER NAMED SIOUX and the auctioneers' comments influenced her bidding on SHINERS LENA DOC.  Elizabeth Weston was the final bidder.  She paid $190,000 for SHINERS LENA DOC.

136.     In addition to SHINERS LENA DOC, Weston bought four other horses at the auction (including two mares that were in foal) and three embryos.  One of the horses she bought was JRC QUIXOTE O LENA, which was on the Red List with a suggested price of $20,000.  Weston paid $12,500 for JRC QUIXOTE O LENA.

137.     Weston testified, credibly, that she would not have attended the dispersal sale if she had known about the pre-auction deal between Rose and the Aarons.

138.    In addition to the Blue List Horses, the Aarons were the winning bidders on 10 Red List Horses. The Aarons did not have a pre-auction agreed price with respect to the Red List Horses. They bid dollar-for-dollar along with the other attendees.

139.    The "hammer price" for the 10 Red List horses was approximately $920,000. The Red List Horses the Aarons purchased included the mare named SHINERS LADY LUCK.

140.    The terms of the dispersal sale required a bidder to pay for any lot for which they were the final bidder on the day of the dispersal sale. Winning bidders signed a separate acknowledgement of purchase for each horse on which they were the final bidder.

141.    Eleise Blake attended the dispersal sale. After each horse was sold, runners would take an acknowledgement form to the highest bidder to be signed. Blake used the acknowledgement forms to create bills of sale, and she put together packets for the buyers to take when they came to check out and pay for their horses.

142.    The Aarons never came to check out and pay for the 10 Red List Horses after the auction. Lori Aaron understood that she would have until August 30, 2013, to pay for the Red List Horses. She exchanged emails with Lewis Stevens after the auction reconciling what the Aarons had actually purchased from the Red List with what she thought they had purchased.

143.    All of the paperwork at the auction reflected the final, "hammer" price for the horses. However, the auctioneers did not receive a commission on the "hammer" prices for the Aarons. With respect to the Blue List Horses, the auctioneers received a commission based on the prices set forth on the Blue List.

144.    The total auction sales of horses and equipment, based on the actual sale prices, was $7.2 million according to the figures Eleise Blake provided to Rose for the purpose of

calculating the auctioneer's fees.[4]  This figure includes the approximately $3.1 million the Aarons paid for the Blue List Horses prior to the auction (excluding SHINERS LENA DOC) as well as the approximately $1 million the Aarons bid for ten Red List Horses.

145.    Other than the Aarons, the only parties who paid more than $70,000 for a horse at the auction were Elizabeth Weston (who paid $190,000 for SHINERS LENA DOC), Trey Neal (who paid $210,000 for SHADY LITTLE SHINER), and Kay Williams (who paid $200,000 for MINI HOT FLASHES and $120,000 for SIOUX SEEIN STARS).

146.    Immediately after the auction, Rose, McLaughlin, and the Aarons gave interviews to the press.  They all expressed pleasure at the results of the auction.

147.    On Sunday after the auction, Weston and Froschl returned to the Gainesville Ranch to meet with Rose.  During that meeting, Rose stated that she was willing to help them bring 100 mares a year to SHINERS LENA DOC.  Rose also agreed to board and care for SHINERS LENA DOC – along with the other four horses Weston had purchased – at the Gainesville Ranch.

148.    Rose and Weston did not enter into a formal agreement regarding the promotion of SHINERS LENA DOC as a stud.  According to the testimony of Rose's veterinarian, Dr. Katherine Joos, Rose had wrapped up her 2013 breeding season in mid-July of that year.  During their discussion, Rose did not tell Weston that Weston would be a client of Aaron Ranch.

### G.    The Deal Falls Apart

149.    After the auction, Rose published the results in various quarter horse news publications.  She directed Eleise Blake to supply the sale results for use in the publications.  Eleise Blake supplied results reflecting the hammer prices of the horses at the auction.

---

[4] Since Rose had no interest or only a partial ownership interest in some of the horses that were sold to the Aarons or auctioned, she did not keep all of the proceeds from the horse sales.

150.     Meanwhile, Lori Aaron and Rose were negotiating an agreement that would allow the Aarons to pay for the Red List Horses in installments.  The Aarons visited with Rose at her home on August 29, 2013.  The next day, they signed, or thought they signed, an installment agreement with Rose.[5]  The Aarons also tendered the first rent payment due under the Lease on August 30, 2013.

151.     Although the Confidential Term Sheet, Lease, and Consulting Agreement contemplated that the Aarons would take over the expenses of running the Gainesville Ranch, the documents did not specify when or how this would be accomplished.

152.     Rose had assumed or expected that the Aarons would deposit $200,000 into the business account for the Gainesville Ranch each month, and Nelle Murphy and Eleise Blake would use the funds to pay bills as usual.  However, when negotiating with Rose, Lori Aaron had assumed or expected that her daughter would be the office manager for the Gainesville Ranch and that her daughter would oversee the Gainesville Ranch's bills and expenses.

153.     After the dispersal sale, the Aarons took over payroll for the Gainesville Ranch. The first payroll was due at the end of August.  Lori Aaron began gathering the information she needed for the payroll and discovered that Rose had given pay raises to employees.  She also discovered that Rose had not kept personnel files or have any of the information necessary for direct deposits.  Lori Aaron sent her daughter to the Gainesville Ranch to collect the necessary information from employees.

154.     Lori Aaron provided Rose with checks for an Aaron Ranch bank account.  In an email on August 30, 2013, Rose requested deposit slips and electronic checks as well.  Rose also

---

[5] A dispute subsequently arose between Rose and the Aarons over payment for the Red List Horses.  The dispute over the Red List Horses has been settled and is not part of this proceeding.

informed Lori Aaron that she would start sending bills to outside customers from the Aaron Ranch (rather than Carol Rose Quarter Horses) at the beginning of October.

155.     On September 1, 2013, Rose responded to an inquiry from a potential customer who wanted to breed her mare with A SHINER NAMED SIOUX.  Rose explained that the Aaron Ranch now owned the stud but would be standing the "2014 season here at Aaron Ranch, formerly Carol Rose Quarter Horses."  She explained that she would continue to manage the stallions and communicated the breeding fees.

156.     At the beginning of September 2013, the Aarons deposited approximately $45,000 into the operating account for the Gainesville Ranch.  Rose sent Lori Aaron an email on September 4, 2013, explaining her understanding that the Aarons would deposit $200,000 each month.  She also stated that, as a consultant, "I can not and will not worry whether the bills can be paid on time and about the financing of this ranch.  My reason I sold out was to get out from under that stress."

157.     Upon the Aarons taking over payroll, McLaughlin became a trainer whose services were paid for by the Aarons.  In cowboy terms, McLaughlin and the other employees at the Gainesville Ranch were now riding for a different brand.

158.     McLaughlin and the other employees, including an assistant horse trainer named Luke Searcy, openly discussed the fact that they were now riding for a different brand.

159.     Nonetheless, Rose remained as a "consultant."  Rose understood the Consulting Agreement to mean that she would run the Gainesville Ranch as usual.  Indeed, her duties under the Consulting Agreement amounted to continuing to manage the daily operations of the Gainesville Ranch.  The Consulting Agreement provided that Rose "consult on and supervise" all areas of the Aarons' horse training, breeding, board, and sales business, including "the use and

contracting with third parties for the provision of veterinarian, farrier, training and other services," and the general care and upkeep of the Gainesville Ranch.

160.     It quickly became apparent that Rose and the Aarons had different visions of what it meant to be a "consultant."  Rose told employees that while the Aarons were signing the paychecks, she was still the boss.  She demanded allegiance to herself and became angry when she felt disrespected by employees or anyone associated with the Gainesville Ranch.

161.     For example, on September 5, 2013, Rose was abusive to a long-time customer, Mattie Neal Alexander.  Rose publicly accosted her, told her not to return to the Gainesville Ranch, called her a profane name, and repeatedly clapped her hands in Ms. Alexander's face to stop her from speaking.

162.     Rose's testimony that Ms. Alexander disrespected her that day by telling Rose that she was no longer in charge was not credible.  Ms. Alexander testified, credibly, that she was confused and offended by Rose's verbal attack, which came out of nowhere as she was returning her horse to a barn.  Although Ms. Alexander was a long-time customer who enjoyed working with McLaughlin, she never returned to the Gainesville Ranch.

163.     Ms. Alexander's father, J.T. ("Trey") Neal, III, considered Rose a personal friend. He had boarded several horses at the Gainesville Ranch since 2009.  In addition, McLaughlin trained his horses and worked with Ms. Alexander, who showed horses at competitions.  He was upset by Rose's attack on his daughter and began looking for a place to move his horses.

164.     After the dispersal sale, the transition of control to the Aaron Ranch did not go smoothly.

165.     The Aarons and Rose clashed over how to answer the telephones.  Rose had used the same telephone number for business and personal calls for decades.  The number did not change

after the dispersal sale.  The Aarons wanted to use the same number, but they wanted Rose and her staff to answer calls by saying, "Aaron Ranch."  Rose testified, credibly, that when she answered the phone by saying "Aaron Ranch," callers hung up and redialed the number.

166.    Rose and her staff began answering the phone by saying, "Aaron Ranch, Carol Rose."  The Aarons, especially Phillip Aaron, did not like this solution.  Rose suggested that the Aarons pay for their own, separate business telephone line at the Gainesville Ranch.  The Aarons responded that Rose should forward her personal calls to a personal line.

167.    On September 11, 2013, Rose and McLaughlin took some of the horses to the Aaron Ranch in Commerce, Texas, to work with them.  When they arrived, Rose told McLaughlin and the other trainers where to stall each horse.  McLaughlin testified, credibly, that Rose put A SHINER NAMED SIOUX in an appropriate stall for a stallion.

168.    At some point, Rose decided to rearrange the horses to get the mares away from A SHINER NAMED SIOUX.  She also instructed an assistant trainer to remove A SHINER NAMED SIOUX from his stall and take him to the arena where they would be working. McLaughlin was in the arena and saw the assistant trainer approaching with the stallion. McLaughlin was upset because the assistant trainer was unfamiliar with A SHINER NAMED SIOUX and might injure the stallion or himself or both.

169.    McLaughlin and Rose exchanged heated words.  After the argument, McLaughlin apologized to Phillip Aaron, who had witnessed the scene.  Rose walked away.

170.    Rose's testimony that McLaughlin put A SHINER NAMED SIOUX in a plywood stall next to a mare, and that she had acted to save the stallion from injuring himself, was not credible.  Rose had decided where to stall A SHINER NAMED SIOUX as was her custom when she travelled with her horses.

171.     Rose's testimony that the Aarons showed up at her house at 9 p.m. in early September to ask her whether she was going to quit was not credible.  Lori Aaron testified, credibly, that no such meeting occurred.  As previously discussed, however, the Aarons met with Rose at the Gainesville Ranch in late August to discuss the problems they were having with the transition of the Gainesville Ranch operations to the Aarons.

172.     Tensions between Rose and the Aarons continued to rise throughout September.  Phillip Aaron did not like the way Rose was treating the people around her.  Lori Aaron had expected expenses at the Gainesville Ranch to fall with a smaller number of horses.  Expenses for September remained high, however, and Lori Aaron asked for explanations regarding various bills Rose was forwarding to Aaron Ranch to pay.

173.     Lori Aaron also noticed that Rose was using Aaron Ranch checks to pay bills for charges that Rose had incurred prior to the start of the Lease, such as electric and telephone bills.  Rose also wrote a check for $3,500 payable to herself.  When questioned by Lori Aaron, Rose explained that she planned to use the $3,500 to go to a horse show.  Lori Aaron asked Rose to supply her with invoices and receipts for accounting purposes.

174.     Rose, in turn, was concerned that Lori Aaron planned to let go some of her help, including her bookkeeper, Eleise Blake.  She was also upset that the Aarons had not immediately paid what they owed for all of the Red List Horses and that they had not deposited $200,000 into her business account to cover monthly operating expenses.

175.     At least one client of the Gainesville Ranch, Kay Williams, testified that she wanted to "get out of the conflict."  Williams had purchased two fillies at the dispersal sale and, initially, boarded them at the Gainesville Ranch to be trained by McLaughlin.  After learning of

the conflict between Rose and the Aarons, she moved her horses to another ranch and engaged a new trainer against McLaughlin's advice.

176.    The Aarons owned several horse trailers and a Freightliner truck for use on the Aaron Ranch in Commerce, Texas.  Rose persuaded the Aarons to buy a new, larger trailer to transport all the horses they would be taking to compete in the 2013 National Reined Cow Horse Association Snaffle Bit Futurity (the "Futurity") in Reno, Nevada.  The Aarons purchased a new nine-horse trailer but discovered that their old Freightliner truck could not pull it.  The Aarons, therefore, felt pressed to purchase a new Freightliner truck only days before the Futurity.  The Aarons spent $198,000 on the new truck and $115,000 on the new nine-horse trailer.

177.    As they were preparing for the Reno show, Phillip Aaron instructed McLaughlin to brand the Aaron's horses with the Aaron Ranch brand.  McLaughlin did not know which horses were Blue List Horses or Red List Horses.  He branded two of the Red List horses that the Aarons had won at the auction but had not yet paid for, specifically, REYS A SHINE and SUSHI BOSS.  The Aarons eventually paid Rose for both of these horses.

178.    The Aarons noticed an excessive number of horses on the Gainesville Ranch during a visit after the dispersal sale.  Indeed, although the written agreements she had entered into with Aaron Ranch specifically limited the number of horses that she could maintain on the premises after September 1, 2013, to seven, Rose kept and cared for many more horses, including recipient mares carrying a 2014 foal crop.

179.    In mid-September, Lori Aaron requested a list of all the horses on the Gainesville Ranch.  When asked to account for, specify the number, and provide the owners' names and contact information of horses besides the Aarons that she was keeping and caring for, Rose initially

36

resisted.  Rose even asked key employees, including McLaughlin, to lie about the number of horses on the Gainesville Ranch.  McLaughlin refused.

180.     On September 18, 2013, Rose provided a list of horses on the Gainesville Ranch, revealing a number of horses being cared for without charge.  Lori Aaron asked Rose about the excess horses.  Rose explained certain barter arrangements she had previously struck with service providers including the ranch veterinarian, Dr. Katherine Joos, the fertility consultant, Dr. Dickson Varner, and office staff, including, without limitation, Eleise Blake and Nelle Murphy.

181.     Lori Aaron did not intend to continue with bartering arrangements.  Lori Aaron contacted Joos and Blake.  Joos and Blake agreed to bill the Aarons for their services, and Lori Aaron agreed to bill them for services rendered.  Lori Aaron also informed Rose that she would be billing her for the excess number of horses she was keeping on the Gainesville Ranch.

182.     On September, 19, 2013, Rose declared to the Aarons that she did not work for them.  The next day, Lori Aaron asked Rose if she was resigning.  Lori Aaron also told Rose that if Rose resigned, she would hire a ranch manager to replace her.  Lori Aaron separately suggested to McLaughlin that perhaps he could be the manager for the Gainesville Ranch while allowing Rose to continue to offer advice as a consultant.

183.     Rose responded to Lori Aaron, clarifying that she had meant she was a consultant for the Aarons, not an employee.  She stated that she did not intend to resign.

184.     Rose's attorney, Lewis Stevens, sent the Aarons a letter dated September 20, 2013, notifying them that they were in default of the Lease because they had failed to change the name on the utility accounts and obtain required insurance.  The letter also acknowledged that the Lease allowed the Aarons 30 days from the date of the letter to cure any deficiencies.

185.     On September 20, 2013, Lori Aaron asked Rose to leave a key for the office before Rose departed for the Futurity in Reno.  The next day, she asked Rose to send her all the utility information so that she could get the accounts transferred to Aaron Ranch.  Lori Aaron testified that she had expected Nelle Murphy to provide her with details and proactively help her take over the Gainesville Ranch's various bills since she was paying Nelle Murphy to be the office manager.

186.     By September 22, 2013, Lori Aaron had decided to "fight" Rose.  She asked McLaughlin and Ms. Alexander to write up descriptions of their negative interactions with Rose.

187.     On September 23, 2013, Rose wrote a check for $2,517.60 from the Aaron Ranch's bank account to herself.  After Lori Aaron saw Rose write a second check to herself, she called Rose and revoked her authority to write any checks from the Aaron Ranch's bank account.

188.     The Aarons' attorney, Sheppard Sands, sent Rose a letter dated September 24, 2014, stating that Rose was in default of the Lease and Consulting Agreement because she had failed to give the Aarons a key to the office or a list of the entities providing utility services to the Gainesville Ranch.  Nelle Murphy, the office manager, and Eleis Blake, the bookkeeper, had already left for the Futurity when Sands sent the September 24th letter to Rose.

189.     On September 26, 2013, the Aarons sent Rose another letter reminding her that the Aarons had rescinded her authority and ability to "write any checks on any account that belongs to the Aarons" and further required Rose "to provide Lori Aaron with an invoice and receipt for each purchase made … ."

190.     By this time, the Aarons were exploring their options if their arrangement with Rose were to terminate.  They looked at a nearby horse ranch suggested by McLaughlin on September 27, 2013.  Lori Aaron also asked McLaughlin if the Red List Horses they had won at the auction were worth the prices they had agreed to pay.

191.    Trey Neal visited the Gainesville Ranch in late September.  Neal had purchased one horse at the auction, SHADY LITTLE SHINEY, for $210,000.  This was the most he had ever paid for a horse.  Neal was concerned because the American Quarter Horse Association ("AQHA") had received ownership transfer papers from Rose for some of the horses sold at the auction, but not for his.

192.    The altercation between Neal's daughter and Rose had occurred less than one month before his visit to the Gainesville Ranch.  Neal had not yet removed his horses from the Gainesville Ranch.  In fact, at the time of his visit, one of his horses, PEACHES, was competing at the Futurity in Reno.

193.    Neal was in contact with McLaughlin during this time.  On his way to the Gainesville Ranch, Neal decided to surreptitiously record his conversation with Rose.

194.    During the recorded conversation, Rose accused McLaughlin of various lies, bad acts, and professional incompetence as a horse trainer.  She complained that the Aarons still owed her $1 million for the Red List Horses.  She represented to Neal that the Aarons had made McLaughlin the manager for the Gainesville Ranch and that he was coming to fire her on Monday, October 8, 2013, as soon as he returned from Reno.  She also advised Neal to take some extra blankets and tack to Reno when he went to watch the Futurity finals.

195.    The Aarons tendered the rent for October 2013 to their attorney for delivery to Rose's attorney at the appropriate time.  On October 4, 2013, Sands confirmed his understanding of an agreement between himself and Lewis Stevens that the September 30, 2013 lease payment for October 2013 should be held by Stevens pending the outcome of ongoing negotiations that were underway seeking resolution of the numerous issues between Rose and the Aarons that had come to light up to that point.

## H.        The 2013 Snaffle Bit Futurity

196.        The 2013 National Reined Cow Horse Association Snaffle Bit Futurity was slated to begin in Reno, Nevada, on September 24, 2013.  Several of the horses the Aarons had purchased from Rose had already been trained and prepared for the show by McLaughlin.

197.        Since the Aarons had not yet purchased show tack of their own, Rose agreed that they could use hers for the Futurity.  Prior to McLaughlin's departure, Rose had some of her personal tack and equipment loaded into a truck and trailer for the express purpose of allowing McLaughlin and the Aaron Ranch to use the tack and equipment during the Futurity.

198.        The Aarons planned to take seven horses to the Futurity, including BLINDSIDED and SHINERS LADY LUCK.  The Aarons paid Rose for SHINERS LADY LUCK, which was one of the Red List Horses, prior to leaving for Reno.

199.        McLaughlin drove the new truck and nine-horse trailer to the Futurity.  The trailer allowed sufficient capacity for Rose to transport the Aarons' seven horses as well as a horse for Nelle Murphy and a horse for Dr. Dickson Varner.  Lori Aaron testified that they would not have needed to buy the new truck and nine-horse trailer if Rose had not taken two of her service providers' horses to Reno.

200.        Almost immediately upon McLaughlin's departure for Reno on September 19, 2013, Rose ceased taking his telephone calls.  McLaughlin also encountered difficulty in using the credit card Rose had provided him.

201.        Nelle Murphy left for Reno on September 20, 2013.  She did not return to the Gainesville Ranch until October 10, 2013.  This was a critical time for the office manager for the Gainesville Ranch to be absent, because the Aarons were still in the process of taking over the operating expenses for the Gainesville Ranch as provided in the Lease.

202.     While *en route* to Reno, McLaughlin called his wife, Wendy, and asked her to check the tack at the Gainesville Ranch.  McLaughlin asked her to see if some show tack, including headstalls, was still at the Ranch.  He asked his wife to pack the missing tack in a box and send it to Reno with Eleise Blake, who was scheduled to travel to the Futurity to show her own horse in the next few days.

203.     Wendy did as her husband asked and sent the tack to Reno with Blake.  Blake left on September 21st, hauling her own horse to Reno.  However, Rose called Blake and instructed her to remove the headstalls before giving the box to McLaughlin.

204.     Shortly thereafter, Rose told Phillip Aaron that the Gainesville Ranch was about to run out of feed for the horses.  Phillip Aaron asked McLaughlin to have someone check the feed at the Gainesville Ranch.  On September 27, 2013, McLaughlin instructed Luke Searcy, who had remained behind at the Gainesville Ranch, to count the feed bags.  Searcy counted the feed bags that afternoon and informed McLaughlin of his findings.  It appeared to McLaughlin that there was plenty of feed.

205.     There was gossip at the Futurity that the transfer of Carol Rose Quarter Horses to the Aaron Ranch was not going well.  Rose testified that a horse trainer named Don Murphy called her from the Futurity and told her that McLaughlin intended to fire her when he returned to the Gainesville Ranch.

206.     After several days at the Futurity, McLaughlin qualified for the finals.  McLaughlin was riding several of the Aarons' horses in the competition, including BLINDSIDED.  The Aarons flew to Reno to watch the Futurity finals on or around October 3, 2013.

207.     On October 3, 2013, the Rose Parties sued the Aaron Parties in Cause No. CV13-535 in Cooke County, Texas, which suit was removed to this Court into Adversary

41

Proceeding 17-4104. Late in the afternoon on October 3, 2013, Rose locked the gates that led to the horse barns.

208.     Rose stated that the basis for filing the state court suit was the rumor she heard regarding McLaughlin's plans to fire her upon his return from Reno. At trial, McLaughlin admitted that he told several acquaintances during the show that he would like to fire Rose because of the way she was acting. While there is conflicting testimony about what, exactly, McLaughlin said, the Court finds McLaughlin's testimony credible. McLaughlin knew that he did not have the authority to fire Rose, and he never requested such authority from the Aarons.

209.     Later that evening, on October 3, 2013, Luke Searcy drove his pickup from his home on the Gainesville Ranch to the horse barns. Rose testified that she had received a pallet of feed that afternoon and that she later learned that Searcy went to the barn where the pallet was stored to count the bags on the pallet. In addition, when McLaughlin was out of town, Luke Searcy checked the horses every evening before bed.

210.     Rose saw Searcy's truck approaching the horse barns. She testified that "the only one who drives a pickup that was employed at that time was Luke Searcy." Rose grabbed a loaded shotgun and went out to confront him.

211.     Rose and Searcy argued. Rose slapped Searcy several times while holding the loaded shotgun. Searcy called McLaughlin, who told him to call the sheriff. Searcy called the sheriff, who came to the Gainesville Ranch. Searcy made a report but declined to press charges.

212.     During the same time period, Rose attempted to sabotage McLaughlin's performance at the Futurity finals competition. She sent a private investigator and security firm to approach McLaughlin in Reno while he was preparing for and competing in the Futurity.

213.     In particular, on or about Friday, October 4, 2013, the private investigator approached McLaughlin while he was preparing to compete and handed him a letter from an attorney in Reno whom Rose had hired.  The letter stated "... you are most welcome to continue using Carol's equipment, bridles, etc. that belong to her which you have in your possession, through the end of this show," but then demanded the return of Rose's tack immediately upon completion of the Futurity.  The letter also stated, "In the spirit of cooperation and respecting the 'cowboy way', may I have your word as a gentleman that you would agree to return all of Ms. Rose's property promptly at the conclusion of this show, tomorrow evening?"  McLaughlin agreed with the investigator to secure all of the tack and to make it available to Rose in Reno on the morning of October 6, 2013, the day after the completion of the finals competition.

214.     Even though McLaughlin and Rose's investigator made this agreement "in the cowboy way," Rose's Nevada attorney, who signed the aforementioned letter, sued McLaughlin in a Nevada court for return of the tack at 4:40 p.m. on October 4, 2013 (the "Nevada lawsuit"), immediately after McLaughlin made the agreement to return the tack.

215.     Sometime during the night of October 4 - 5, 2013, Rose's agents broke into the locked stall where McLaughlin had secured the tack and removed everything but a few water buckets.  All of Rose's tack that she had agreed that McLaughlin and the Aarons could use until the end of the show was gone.  McLaughlin immediately reported the break-in as a theft to the police.  Since the tack had been removed by Rose's agents, the police concluded that the matter was a civil dispute, and no police action was taken.  McLaughlin and the Aarons had to immediately locate and purchase replacement tack to enable McLaughlin to compete in the finals that same day.

216.    Rose travelled to Reno to watch the Futurity finals.  Rose testified that she was there for one night to retrieve her tack.

217.    On the evening of Saturday, October 5, 2013, just as McLaughlin was riding into the arena to compete in the finals of the Futurity, Rose's investigator approached McLaughlin and, as Rose watched from the crowd inside the arena, served him with Rose's Nevada lawsuit, accusing McLaughlin of taking her tack without her permission and of refusing to return it.  McLaughlin accepted the Nevada lawsuit papers.  Despite the distraction engineered by Rose, McLaughlin rode the Aarons' stallion, BLINDSIDED, into the arena and earned the highest score of the evening.

218.    McLaughlin did not return to work at the Gainesville Ranch after the Futurity.  He eventually recovered his personal belongings and moved to work at the Aarons' facility in Commerce, Texas.

## I.    Rose Locks Out the Aarons

219.    After filing the lawsuit against the Aarons, Rose hired an armed security company to prevent McLaughlin and the Aarons from accessing the Gainesville Ranch.  The Aarons attempted to visit the Gainesville Ranch on Monday, October 7, 2013, but discovered an armed security guard standing beside the locked gates to the Ranch.  Locked within the ranch were most of the horses and equipment for which the Aarons had paid Rose millions of dollars (including A SHINER NAMED SIOUX), and McLaughlin's personal property.

220.    To regain possession of their horses, Rose demanded that the Aarons pay her $101,948.50, purportedly on account of a "stableman's lien."  Her attorney, Lewis Stevens, sent a letter to the Aarons' attorney that attached a spreadsheet detailing the charges.  The spreadsheet reflected that the $101,948.50 demanded by Rose included all costs that Rose believed were owed to her by the Aarons pursuant to the Agreements, such as the cost of utilities for the whole Ranch,

feed for all the horses under the Ranch's care, etc.  Indeed, less than half of the amount for which Rose asserted a stableman's lien related to the care and boarding of the Aarons' horses.  Rose admitted at trial that the inclusion of these costs were "errors" that she blamed on her attorney, Lewis Stevens.

### J.    Rose Re-Opens Carol Rose Quarter Horses for Business

221.    Shortly after locking the Aarons and McLaughlin out of the Ranch, Rose resumed her performance quarter horse breeding and showing operations as if the dispersal sale had never occurred.

222.    On December 19, 2013, Rose announced on her Facebook page the following:

EFFECTIVE IMMEDIATELY: Carol Rose has announced that Carol Rose Quarter Horses is reopening as a breeding and reproductive center.  We have many recipient mares available and will be able to offer embryo transfers.  Stay tuned for a list of stallions that we will be standing! - at Carol Rose Ranch.

223.    Since December 19, 2013, Rose has posted numerous announcements on Facebook and in other publications that she is standing numerous stallions at the ranch, including SHINERS LENA DOC.  Rose has occasionally traveled out of state for competitions and shows.

### K.    Rose's Post-Dispersal Sale Relationship with Weston

224.    Weston kept her horses at the Gainesville Ranch after the auction.  Rose sent monthly invoices to Weston for the boarding and care of the horses.

225.    Weston formed Equis Equine, LLC, after the auction (on August 21, 2013).  Weston also set up a "personal" checking account that she designated as the "Equis Equine Account." Weston transferred funds from other personal accounts into the Equis Equine Account.  Equis Equine paid the boarding fees and other charges billed to Weston by Carol Rose Quarter Horses.

226.    Rose sent Weston an invoice dated September 30, 2013, for $981 for the care and boarding of Weston's horses during September.  The invoice was from Carol Rose Quarter Horses,

and Equis Equine promptly paid.  Thereafter, Rose continued to bill Weston for boarding and other services at the Ranch under invoices for Carol Rose Quarter Horses.

227.    Weston became aware of a conflict between the Aarons and Rose in late September 2013.  She initially believed Rose's version of events and offered her support.

228.    In early February, Rose took SHINERS LENA DOC to a breeding facility to collect his semen.  Rose forgot about SHINERS LENA DOC and left him there all month.  Weston discovered the problem when the facility called her.

229.    On February 29, 2014, Weston asked to return SHINERS LENA DOC to Rose in exchange for getting her money back.  Rose refused.  However, the messages they exchanged over the next several months remained cordial.  Weston purchased one additional horse from Rose at some point.

230.    In early 2014, Weston negotiated with Rose for the purchase of three Red List Horses that Rose had purportedly sold to the Aarons at the auction.  Weston paid Rose for the three horses at the beginning of March 2014.  Weston later discovered that Rose did not have clear title to the horses; the AQHA informed Weston that the titles were being held pending the outcome of Rose's litigation with the Aarons.  Weston demanded her money back.

231.    At some point, Weston attempted to train one of the horses she had purchased from Rose at the auction (DARLING SIOUX) for mounted horseback archery.  Weston did not attempt to train any of the other horses she had purchased from Rose.

232.    In July 2014, Weston established a business checking account for Equis Equine, LLC.  Equis Equine paid the invoices Weston received from Carol Rose Quarter Horses from that account beginning in July 2014.

233.    Rose failed to provide Weston with various promised documents, such as health certificates and a studbook for SHINERS LENA DOC. Rose repeatedly claimed to have sent the requested documents to Weston, but Weston testified that the documents never arrived.

234.    By September 2014, Weston was frustrated that Rose had refused to provide her with quality photographs of SHINERS LENA DOC so that she could promote him as a stud. Rose responded that she was not a photographer and that she did not have permission to forward Weston the photographs taken by others.

235.    In early September 2014, Weston found and forwarded to Froschl several news articles about the litigation between Rose and the Aarons. She also travelled to the courthouse in Cooke County, Texas, where the state court action was pending between Rose and the Aarons. Weston was alarmed by what she read in the documents filed in the state court lawsuit.

236.    On September 11, 2014, Weston travelled to the Gainesville Ranch prepared to pay whatever Rose said she owed for boarding fees, etc., so that she could get her horses off the Ranch. Rose refused to release SHINERS LENA DOC until after Weston's check cleared.

237.    On or about August 7, 2015, Weston and Equis Equine sued Rose, Rose, Inc., and the Aarons, among others, in the 235th Judicial District Court in Cooke County, Texas, which action was removed to this court as Adversary Proceeding 17-4125.

238.    In February 2016, Equis Equine sold all of the horses Weston had purchased at the dispersal sale except SHINERS LENA DOC. Equis Equine received $36,040 for the horses from a reputable public auction in San Antonio, Texas.

239.    Equis Equine spent $181,325.18 in the care, boarding, and expenses associated with the dispersal sale horses from the date of the auction until the horses (with the exception of SHINERS LENA DOC) were sold at the auction in San Antonio.

47

240.    Weston did not advertise SHINERS LENA DOC for sale at the auction in San Antonio.  Equis Equine continues to own SHINERS LENA DOC.

### L.    Rose's Post-Dispersal Sale Conduct

241.    Rose actively monitored the Aarons' business well into 2015.  Phone records introduced at trial indicate that from April 2014 through early October 2015, Rose was involved in a series of telephone conversations and text messages with an Aaron Ranch employee named Matt Humphrey.  A dozen or more phone calls took place during that time frame, most clustered around the times that Humphrey was attending horse shows as an assistant trainer to McLaughlin.

242.    Humphrey was aware that the Aarons, who were his employers, were involved in litigation with Rose.

243.    On October 3, 2015, it was brought to the attention of the Aarons that Humphrey was secretly communicating with Rose while at the 2015 Snaffle Bit Futurity in Reno, Nevada.  Don Gordon, the Aarons' attorney in the state court lawsuit, flew to Reno to interview Humphrey.  Rose called, texted and left messages for Humphrey before, during, and after the interview and the decision to send Humphrey back to Texas.  In a voicemail presented at trial, Rose indicated to Humphrey that she would be willing to help him find a new job and would, in fact, allow him to stay at the Gainesville Ranch if he needed a place to stay.

244.    After the Humphrey interview, McLaughlin and Gordon, accompanied by a relative of Humphrey, went to the locked Aaron Ranch tack room at the showgrounds to examine and videotape the contents of Humphrey's backpack.  The backpack contained some injectable veterinary drugs and syringes.  McLaughlin was previously unaware that Humphrey might be administering drugs to the Aarons' horses, but he described the horses' performances at the shows

Humphrey attended as relatively poor and consistent with having been sedated with the drug Acepromazine found in Humphrey's backpack.

245.     McLaughlin testified that, during the same period of time, three horses at Aaron Ranch exhibited unusual health issues resulting in all three of the horses foundering to various degrees.  He testified that one of the horses died, one recovered but could no longer be ridden, and one recovered completely.  He further testified that no such health issues had been experienced at Aaron Ranch prior to Humphrey's employment, and none have happened in the years since. [6]

246.     At trial, Rose complained that McLaughlin had failed to return a pair of her chinks (short chaps) that he took to Reno in 2013.  She testified that Humphrey sent a photograph of the chinks to her farrier, Tommy Spradling, Jr., with a location stamp showing that the photograph was taken in Commerce, Texas, where the Aaron Ranch is located.  She testified that Spradling showed the photograph to her.

247.     Spradling testified that he had not received any such photograph from Humphrey, shown the photograph to Rose, or even seen the photograph in question.  Spradling's testimony was highly credible.  Rose's testimony regarding the allegedly missing chinks was not credible.

### M.     The Aarons Move the Blue List Horses to Commerce, Texas

248.     After the Aarons were locked out of the Ranch in Gainesville, Texas, they were forced to quickly find a place to house their new performance quarter horse operation.  Importantly, that task included finding proper facilities to board, train, and breed the high-end performance

---

[6] In the pre-trial order, the Aarons sought to recover for the damage Humphrey allegedly did to their horses at Rose's direction.  They did not include this claim as an element of their alleged damages in their proposed findings of fact and conclusions of law submitted after trial.  Rather, they referred to Humphrey as an example of Rose's continued competition with the Aaron Ranch in the performance quarter horse industry in violation of her agreements with the Aarons.

quarter horses that they had just purchased from Rose in anticipation of taking over her place in the performance quarter horse business.

249.     The Aarons decided to relocate their new horses and their quarter horse operations to their ranch in Commerce, Texas.  Substantial improvements were required to take the Aaron Ranch from one designed for working ranch horses and cattle to one that could properly accommodate high-end performance quarter horses.

250.     Specifically, McLaughlin testified that the Aarons were required to very quickly replace almost all of the fencing at Aaron Ranch, which was about five miles long.  Prior to October 2013, the Aaron Ranch's fencing was primarily barbed wire, which is unsuitable for high-end performance quarter horses.  McLaughlin also identified in photographs the equipment that had to be purchased for the breeding barns.  Finally, McLaughlin identified in photographs numerous infrastructure improvements that had to be made to the Aaron Ranch to accommodate the new quarter horse business, including dozens of new stalls, a completely new breeding facility and laboratory, at least a dozen run-in sheds and paddocks, and two new lighted paddock areas to cycle the mares for breeding.

251.     In addition, at trial, the Aarons proffered testimony of Lori Aaron regarding the improvements required due to Rose's failure to allow the Aarons to operate at the Ranch in Gainesville, Texas.  In the proffered testimony confirmed that: (1) Lori Aaron is personally familiar with the improvements at the Aaron Ranch that were depicted on the photographs introduced and received in evidence on June 11, 2018 by McLaughlin during his testimony regarding improvements that were made to Aaron Ranch after October 1, 2013; (2) that the improvements were made as a result of having to remove the Aarons' equine operation that they had intended to conduct at the Gainesville Ranch; and (3) that those improvements were required, because the

high-end performance horses purchased from Rose could not be kept in the facilities that existed at that point in time at the Aaron Ranch.

252.　　After the proffer, Lori Aaron testified about the expenses associated with those necessary improvements and the circumstances surrounding their implementation.

253.　　Lori Aaron first explained the sheer chaos of trying to create a suitable ranch overnight.  She described people running in every direction and employees stepping outside their traditional roles.  By way of example, she described handing off a credit card for employees to use to buy rolls of wire or loads of pipe for fencing.  She also described the difficulty she encountered in capturing the expenditures for the improvements after the fact.

254.　　Lori Aaron further testified that she has personal knowledge of the bills paid regarding these improvements, including the expenses claimed in this lawsuit.  The bills go through her office; she is the primary person approving invoices and signing checks.  Thus, while she is not able to confirm the exact amount they spent on the necessary improvements, she testified that she has personal knowledge of the amounts that she can clearly document and that she seeks from this Court.

255.　　The first category of expenses Lori Aaron described was the out-of-pocket cost for the proper fencing for high-end performance quarter horses like the ones the Aarons purchased from Rose.  Lori Aaron testified that at a minimum they spent $30,000.00 on the upgraded fence.  Given that the Aaron Parties had to install five miles of fencing and that all of the expenses included in the $30,000.00 were for labor costs, Lori Aaron testified, credibly, that she was certain the fence cost a great deal more.  However, Lori Aaron confirmed that the Aarons are only seek damages relating to the expenses that she was able to capture.

256.    The second category of expenses that Lori Aaron described was the out-of-pocket costs for equipment to supply the breeding barn.  Lori Aaron testified that the expenditures she was able to confirm totaled $179,000.00 just for equipment for the breeding barn, and even this number is understated due to the inability to document all the expenses.  Lori Aaron confirmed that this amount did not include the building of the structure, and the photographs (as well as the testimony of McLaughlin and Lori Aaron) make clear the building itself could not have been built for only $179,000.00.

257.    The final category of expenses Lori Aaron described included the cost of building and improving the general infrastructure at Aaron Ranch, including building and converting the structures, pens, and facilities McLaughlin identified as necessary to properly board, train, and breed the high-end performance quarter horses.  Lori Aaron confirmed that this category of expenses included the costs associated with numerous projects, including the building of stalls, concrete pads, pens, paddocks, and structures overlooking the other facilities.  She then testified that she could only capture and confirm a portion of the expenses associated with the general infrastructure improvements, but could absolutely confirm the expenses were at least $900,000.00.  Lori Aaron again confirmed that $900,000.00 could not have built the infrastructure represented in the photographs of the post-October 2013 improvements to Aaron Ranch.

258.    Lori Aaron's testimony was credible and specific.

259.    As such, the total expenses captured by the Aarons, and personally confirmed by Lori Aaron, totaled $1,109,000.00.   The Aarons are seeking the cost of these permanent improvements to their property as damages in this proceeding.

### N.      Value of the Blue List Horses and SHINERS LADY LUCK

260.      In this proceeding, the Aarons also contend that they overpaid for the Blue List Horses and SHINERS LADY LUCK.

261.      First, the Aarons complain that Rose overvalued the mares on the Blue List.  The Blue List Horses included 14 mares with prices ranging from $35,000 to $250,000 (paid in full before the auction).

262.      As evidence of overvaluation, the Aarons rely on a statement Rose made to a prospective buyer a few months before the dispersal sale that most of her mares "are worn out and will need to be replaced."  In addition, Lori Aaron testified that the Blue List mares have only produced 20 foals in the five years since she purchased them from Rose.  The most expensive mare, the one she purchased for $250,000, has produced only one foal, which required in vitro fertilization.

263.      Rose's comments about "worn out" mares were not specifically directed at the Blue List Horses.

264.      With the possible exception of ROOSTERS CUTE WILSON, Rose disclosed the ages of the horses on the Blue List.  Although the Aarons negotiated with Rose for several months, they did not seek an independent appraisal of any of Rose's horses.

265.      At trial, Rose's veterinarian, Dr. Katherine Joos, disagreed with Rose's statement that her mares were "worn out."  Joos had provided veterinary services to Rose for several years prior to the auction and was familiar with Rose's horses.  Joos explained that mares, on average, can breed well into their 20s.

266.      More generally, the Aarons complain that they overpaid for the Blue List Horses based on an appraisal they obtained during the state court litigation.  The appraiser, Carl Thurow,

determined that the value of those horses was approximately $2,087,100.00 less than what the Aarons paid.

267.     At trial, the Aarons presented Thurow as an expert equine appraiser who appraised the group of horses purchased by the Aarons in August 2013.  This group included SHINERS LADY LUCK, which was a horse from the Red List, and the Blue List Horses, other than SHINERS LENA DOC (purchased by Weston) and SIOUX IN A DRESS (deceased).  In his testimony, he confirmed the findings in his prior appraisal and testified that the prices Rose assigned to these horses were inflated by tens of thousands of dollars – with several overpriced by $70,000 or more.

268.     Rose contends that the fair market value of the Blue List Horses was at least what the Aarons agreed to pay for them.  Rose points out that the hammer prices for the Blue List Horses equaled or exceeded the amount identified in the Confidential Term Sheet by $695,000.

269.     At trial, Rose presented the testimony of Jay Proost, a personal property appraiser, to counter Thurow's testimony.  He did not offer his own appraisal of the horses.  Instead, he testified that Thurow's methodology was flawed.  According to Proost, Thurow did not have enough information about his "comparable" horses to know whether they were truly comparable to what the Aarons purchased from Rose.  Proost also testified that Thurow erred in failing to focus on horse sales at high-end auctions for his comparables.

### N.     McLaughlin's Claims Against Rose

270.     McLaughlin filed three proofs of claim (collectively, the "McLaughlin Claims") against Rose:  Claim 13-1 in the amount of $51,200.00 for Rose's failure to sign and deliver two AQHA breeder's certificates (also called a registration application) for two fillies sired by A SHINER NAMED SIOUX; Claim 14-2 in the amount of $9,044.25 for Rose's failure to remit

proceeds from the sale of SALLEY O MALLEY and SMART STELLA; and Claim 15-1 in the amount of $5,425.00 for trainer commissions related to the dispersal sale.

271.    With respect to Claim 13-1, McLaughlin complains that Rose failed and refused to sign and deliver two AQHA breeder's certificates for two fillies sired by A SHINER NAMED SIOUX.  One of the fillies was five years old and the other filly was four years old at the time of trial.  McLaughlin repeatedly asked Rose to sign the breeder's certificates so that he can register the fillies with the AQHA.  Rose's refusal to sign and deliver the AQHA Breeder's Certificates prevented him from registering the fillies with the AQHA, which has prevented him from showing the fillies at any registered show and breeding the fillies to a registered stallion.  McLaughlin testified, somewhat vaguely, that he has appealed to the AQHA for help.

272.    McLaughlin previously sold comparable horses for approximately $25,000.00 each.  However, without the breeder's certificates, he testified that the two fillies are worth approximately $500.00 each.  Thus, McLaughlin claims that Rose's refusal to sign and deliver the breeder's certificates damaged him in the amount of $51,200.00.

273.    Claim 14-2 relates to amounts allegedly due to McLaughlin from the sale of two horses, SALLEY O MALLEY and SMART STELLA.  SALLEY O MALLEY is a mare formerly owned by Rose and McLaughlin in equal shares.  SMART STELLA is a mare formerly owned by McLaughlin.  SALLEY O MALLEY was sold prior to the dispersal sale and SMART STELLA was sold at the dispersal sale.

274.    McLaughlin complains that, following the sales of SALLEY O MALLEY and SMART STELLA, Rose failed to remit the full amount of proceeds due to McLaughlin for his interests in these two horses.  The itemization attached to McLaughlin Claim 14-2 indicates that

Rose is indebted to McLaughlin in the amount of $9,044.25 for her failure to remit the full amount of sale proceeds to which McLaughlin is entitled.

275.    Finally, Claim 15-1 alleges that Rose failed to pay McLaughlin a portion of his trainer commissions relating to horses trained by McLaughlin that were sold at the dispersal sale.  McLaughlin specifically alleges that Rose failed to pay him any trainer commissions owed on Lot 15 sold at the dispersal sale and that Rose only paid him a portion of trainer commissions owed on A SHINER NAMED SIOUX after it sold at the dispersal sale.  McLaughlin claims that Rose owes him $5,425.00 for trainer commissions for these two horses sold at the dispersal sale.

### O.    Rose's Alleged Damages

276.    Rose alleges that the Aarons breached the Lease by (1) failing to make any rent payments after the first month; (2) pay other amounts owed under the Lease, including taxes, utilities and maintenance; (3) failing to secure commercial general liability insurance; (4) failing to secure property insurance; (5) failing to secure workers' compensation insurance; and (6) failing to add the Rose Parties as additional insureds under any pre-existing commercial general liability, property, or workers' compensation policies.

277.    Rose formally terminated the Lease effective January 25, 2014.

278.    Rose alleges that by breaching the Lease, the Aarons caused Rose to sustain $221,263.00 in damages, which is broken down by (1) $158,601.00 in damages as a result of unpaid lease installments; (2) $13,811.00 in unpaid repairs and maintenance; (3) $15,460.00 in unpaid taxes; (4) $17,131.00 in unpaid and utilities; and (5) $16,261.00 in unpaid insurance.

279.    Rose likewise alleges that the Aarons breached the Consulting Agreement by terminating Rose without cause.  By breaching the Consulting Agreement, Rose alleges that the Aarons caused Rose to sustain $29,938.00 in damages, which is further broken down as (1)

$22,000.00 in damages relating to the training and board of four horses; and (2) $7,938.00 in damages relating to boarding three brood mares.

### P.    Rose Files for Bankruptcy

280.    Rose filed a bankruptcy petition on September 18, 2017, and Rose, Inc. filed a bankruptcy petition on September 19, 2017.

281.    Rose disclosed her pre-bankruptcy income in her Statement of Financial Affairs filed in her bankruptcy case. Rose disclosed that she earned total income of $2,730,970 in the two years prior to bankruptcy from the operation of Rose, Inc., as well as total income of $882,863.60 from Social Security, horse winnings, and an inheritance. Rose also disclosed numerous personal advances to Carol Rose, Inc. from June 2016 through August 2017 in the total amount of $1,457,515.94.

282.    After the Rose Parties filed for bankruptcy, they removed the Rose-Aaron State Court Lawsuit and the Weston State Court Lawsuit, initiating Adversary Proceedings 17-04104 and 17-04125 respectively.[7] The Weston Parties' claims in the Weston State Court Lawsuit against the Rose Parties are subsumed in Adversary Proceeding 17-4131, and this Court enters judgment on those claims as provided herein. The Weston Parties' claims against the other defendants in Adversary Proceeding 17-4125 were not adjudicated at trial and shall be adjudicated in subsequent proceedings.

283.    The Weston Parties timely filed proofs of claim numbers 7 and 8 in the Rose bankruptcy case and claim numbers 2 and 3 in the Rose, Inc. case (collectively, the "Weston Proofs of Claim"). The Weston Proofs of Claim included a complete Official Form B-10, an addendum

---

[7] The Rose Parties removed both state court lawsuits twice (once for Rose, Inc.'s bankruptcy case and once for Rose's individual bankruptcy case). The removal in connection with Rose, Inc.'s bankruptcy case generated Adversary Proceeding Nos. 17-4105 and 17-4126. Those proceedings were consolidated into 17-0104 and 17-4125, respectively, which are associated with Rose's individual bankruptcy case.

that explained the claims set forth in the Weston State Court Lawsuit, and the original petition in the Weston State Court Lawsuit was attached to the Weston Proofs of Claim.

284.    The Aaron Parties filed proofs of claim numbers 9, 10, 11, and 12 in the Rose bankruptcy case and claim numbers 4 and 5 in the Rose, Inc. bankruptcy case (collectively, the "Aarons Proofs of Claim").

285.    Rose objects to the allowance of the claims filed against her by the Aaron Parties, McLaughlin, and the Weston Parties.  Rose asserts numerous defenses and counterclaims, including breach of the Lease and Consulting Agreement by the Aarons and limitations with respect to McLaughlin's claims.

## III. CONCLUSIONS OF LAW

### A.    The Aarons' Claims Against Rose

### 1.    Breach of Contract

1.    To succeed on a breach of contract claim, a party must show (1) a valid contract, (2) performance or tendered performance by the claimant, (3) breach of the contract by the party against whom the claim is brought, and (4) damages sustained by the claimant as a result of the breach.  *Marquis Acquisitions, Inc. v. Steadfast Ins. Co.*, 409 S.W.3d 808, 813-14 (Tex. App.—Dallas 2013, no pet.).

2.    Here, as to the first element, the Aarons and Rose entered into three written contracts: a Confidential Term Sheet, which summarized the deal and included the Aarons' agreement to purchase specific horses; a Consulting Agreement, which outlined the services Rose agreed to provide; and a Lease with Purchase Option for the Carol Rose Ranch in Gainesville, Texas.  The Confidential Term Sheet, which the parties signed on August 6, 2013, expressly outlined the terms that would be included in the Lease and Consulting Agreement.  The effective

58

date of the Lease was August 15, 2013, and the effective date of the Consulting Agreement was August 19, 2013.

3.      Under Texas law, documents executed at the same time, for the same purpose, and in the course of the same transaction are to be construed together. *See, e.g., In re Prudential Ins. Co. of America*, 148 S.W.3d 124 (Tex. 2004). Moreover, two or more documents that pertain to the same transaction may be read together even if they are executed at different times and do not reference each other, and the courts may construe all the documents as if they were part of a single, unified instrument. *See, e.g., In re Laibe Corp.*, 307 S.W.3d 314 (Tex. 2010).

4.      Here, the documents were part of the same transaction, and the parties intended them to work together as a single, unified instrument. For example, as demonstrated by Rose's decision to lock out the Aarons when she heard a rumor that McLaughlin intended to fire her, Rose did not intend to honor the Lease if the Aarons terminated the Consulting Agreement.

5.      With respect to the second element, Rose breached the Agreements by locking out the Aarons before the time for the Aarons to cure their alleged breaches had expired under the terms of the Lease. The Lease states that while the Aaron Parties were obligated to undertake various tasks listed in the Lease, their failure to do so only becomes a "breach" if the failure is not corrected within 30 days of the written notice of such failure. The first demand letter outlining the alleged breaches was sent on September 20, 2013. The Rose Parties filed a lawsuit and locked the Aarons out of the Ranch in Gainesville well short of 30 days following the initial demand letter.

6.      Rose also breached the Agreements by attempting to conceal the excess number of horses she was boarding for no charge at the Gainesville Ranch (for herself and friends), suddenly terminating her business relationship with the Aarons, and re-opening her quarter horse breeding operations in direct competition with them.

7.     At trial, Rose took the position that the Aarons repudiated the Agreements, breached the Agreements first, and/or that the Aarons failed to satisfy conditions precedent to performance by Rose.  Rose's contentions were not supported by credible evidence at trial.

8.     First, with respect to the Confidential Term Sheet, the Aarons had performed their obligation to pay for the Blue List Horses and bid on them at the auction in order to "win" the registration papers.  With respect to the Consulting Agreement, the Aarons' obligations were all performed (such as providing Rose with access to her residence and the Gainesville Ranch office, providing care for her horses in training and her broodmares, full use and access to vehicles and equipment located at the Ranch to perform her services) or were not yet ripe to perform at the time Rose terminated the Agreements by locking the Aarons out of the Gainesville Ranch (such as providing commissions on the sale of horses under her care).  Finally, with respect to the Lease, the Aarons tendered the rental payment due for October 2013.

9.     Both parties teetered on the edge of breach and repudiation of the Agreements at different times during August and September 2013.  Rose crossed the threshold first.

10.     The Lease does not address how to calculate damages in the event of a breach by Rose.  The Consulting Agreement likewise does not address how to calculate damages in the event of a breach.

11.     With respect to damages, the Aarons are seeking to recover the difference between what they paid for the Blue List Horses and the appraised value they obtained from Thurow, which is $2,087,100.  In addition, the Aarons are seeking to recover a portion of what they spent for the improvements to their ranch in Commerce, Texas, which they were forced to make as a result of Rose's termination of the Lease.   The total amount the Aarons claim relating to these improvements is approximately $1,109,000.00.

12.     With respect to the value of the Blue List Horses, the Court concludes that the fair market value is what the Aarons agreed to pay for them.  Their purchase agreement with Rose was an arms-length transaction.  Further, the Aarons were not buying horses at an ordinary horse auction.  They were buying a select group of horses from a famous breeder prior to her dispersal sale, a sale that had drawn international attention, and they expected the Blue List Horses would form the core of their new business venture.

13.     With respect to the costs of the improvements the Aarons made to the Aaron Ranch in Commerce, Texas, Rose argues they were not injured because the improvements increased the value of their property.  At trial, however, there was insufficient evidence of the increase in value, if any, attributable to the improvements the Aarons made to the Aaron Ranch.

14.     But for Rose's breach of the Agreements, the Aarons would not have needed to improve the Aaron Ranch in Commerce, Texas, to accommodate the performance quarter horses they had purchased from Rose.  The improvements they made to the Aaron Ranch were reasonable and necessary to accommodate the horses and to continue the breeding program they had planned to conduct at the Gainesville Ranch.  The Aarons presented sufficient and credible evidence establishing that they paid at least $1,109,000.00 for improvements to the Aaron Ranch.

15.     In her closing brief, Rose objects that Lori Aaron's "bare testimony" of amounts the Aarons paid to improve the Aaron Ranch is "no evidence."

16.     Lori Aaron's unequivocal testimony regarding the damages caused by Rose's preventing them access to the Gainesville Ranch concerns actual amounts paid by the Aarons to improve the Commerce ranch—a matter of which she has personal knowledge.  Further, Lori Aaron's testimony regarding the amounts paid was clear, direct and positive and not contradicted by any other witness.  *Hudetts v. McDaniel*, No. 07-96-0353-CV, 1997 WL 716883, at *7 (Tex.

App.—Amarillo Nov. 18, 1997).   Under Texas law, a non-expert witness may express an opinion as to the amount of damages although she does not qualify as an expert, so long as that witness is familiar with the facts.  *See Foster v. Burgin*, 244 S.W. 244, 245-46 (Tex. Civ. App.—Amarillo 1922) (concluding that the defendant's unequivocal testimony regarding the market values of property at issue in the case rendered him a competent witness).  Here, Lori Aaron did not merely express an opinion as to damages but testified about her calculation of how much she spent as a result of Rose's breach of the Agreements.

17.     Rose objects that her termination of the Lease benefitted the Aarons in an amount that exceeds what they are seeking for improvements to the Aaron Ranch.  The Lease would have required the Aarons to pay the Rose Parties (as lessors under the Lease) $2.5 million over its five-year term for the use of the Gainesville Ranch as well as maintenance, utilities and insurance.

18.     Rose's argument does not account for the impact that Rose's termination of the Lease had on the Aarons.  The termination of the Lease meant that the Aarons did not have the use of the Gainesville Ranch.  If the Lease had not been terminated, the Aarons would have had the use of the Gainesville Ranch for their new performance quarter horse business for five years as well as the use of the Aaron Ranch in Commerce for their existing business.  Rose's termination of the Lease resulted in the Aarons moving the performance quarter horse business to the Aaron Ranch, which necessarily limits their ability to use the Aaron Ranch for other purposes.  Rose's termination of the Lease also forced the Aarons to spend large sums of money right away rather than spreading out payments over five years.

19.     For the foregoing reasons, the Court concludes that the Aarons have established damages for breach of the Lease in the amount of $1,109,000.00.

20.     The Aarons request that this Court impose joint and several liability on Carol Rose and Carol Rose, Inc.  Carol Rose owns and controls Carol Rose, Inc., and Carol Rose and Carol Rose, Inc., were both lessors under the Lease.  Carol Rose, Inc. does business as Carol Rose Quarter Horses, which is synonymous with Carol Rose.  Carol Rose, Inc. owns the Gainesville Ranch, where Rose's home is located.  Carol Rose, Inc.'s only business office is attached to Rose's home.  Under the circumstances, it is impossible to separate Carol Rose from Carol Rose, Inc., and joint and several liability is appropriate.  *See, e.g., Kramer v. Lewisville Memorial Hospital*, 858 S.W.2d 397, 405 (Tex. 1993) (discussing joint and several liability).

21.     As the prevailing party in a breach of contract claim, the Aarons are entitled to their reasonable and necessary attorney's fees.  *See* TEX. CIV. PRAC. & REM. CODE § 38.001, *et seq*.  The amount of the reasonable and necessary attorney's fees relating to their breach of contract claim will be determined following a separate hearing.

## 2.     Statutory Fraud and Common Law Fraud

22.     The elements of fraud are that a material representation was made, the representation was false, the speaker knew the statement was false when made, the statement was made to induce reliance, it did induce reliance, the reliance was justifiable, and the relying party suffered injury as a result.  *See Grant Thornton LLP v. Prospect High Income Fund,* 314 S.W.3d 913, 923 (Tex. 2010); *Aquaplex, Inc. v. Rancho La Valencia, Inc.,* 297 S.W.3d 768, 774 (Tex. 2009).

23.     In measuring justifiability, Texas courts inquire whether, "given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud[,] it is extremely unlikely that there is actual reliance on the plaintiff's part."  *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010)

(quoting *Haralson v. E.F. Hutton Group, Inc.,* 919 F.2d 1014, 1026 (5th Cir. 1990), which applied

Texas law).

24.  "Fraudulent inducement is a distinct category of common-law fraud that shares the

same elements but involves a promise of future performance made with no intention of performing

at the time it was made." *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015).

With a fraudulent inducement claim, the elements of fraud must be established as they relate to an

agreement between the parties. *Haase v. Glazner*, 62 S.W.3d 795, 798-99 (Tex. 2001); *Clark v.

Power Mktg. Direct, Inc.*, 192 S.W.3d 796, 799 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

25.  "[I]t is well established that the legal duty not to fraudulently procure a contract is

separate and independent from the duties established by the contract itself." *Formosa Plastics

Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998). Accordingly,

"tort damages are recoverable for a fraudulent inducement claim irrespective of whether the

fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an

economic loss related to the subject matter of the contract." *Id.* at 47.

26.  Importantly, to prevail at trial on a fraudulent inducement claim, a party need only

establish a breach of contract combined with "slight circumstantial evidence" of fraud. *Tony Gullo

Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 305 (Tex. 2006). "While a party's intent is determined

at the time the party made the representation, it may be inferred from the party's subsequent acts

after the representation is made." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex.

1986). "Intent is a fact question uniquely within the realm of the trier of fact because it so depends

upon the credibility of the witnesses and the weight to be given to their testimony." *Id.* (emphasis

added).

27.     Here, the Aarons complain that Rose made the following misrepresentations: (1) that she was winding down her business and was selling or leasing its core assets of to the Aarons so that they could take over her place in the performance quarter horse industry; (2) that her auction would be a "complete dispersal sale" and that, after the auction, there would be no more Carol Rose Quarter Horses; (3) that the Blue List Horses were worth the amounts set forth in the Confidential Term Sheet, (4) that the business operations of the Gainesville Ranch were profitable; and (5) that the Blue List Horses would form the core of a successful new business for the Aarons.

28.     Indeed, Rose represented to the Aarons that she was winding down her business, that she would be conducting a complete dispersal sale, that there would be no Carol Rose Quarter Horses after the auction, and that the Blue List Horses would form the core of a new performance quarter horse business that would allow the Aarons to take over her place in the industry.  The Court finds and concludes that these representations were not false when made.  Rose did intend to wind down her business following the dispersal sale.

29.     Rose did not represent and warrant that the Blue List Horses were worth the amounts set forth in the Confidential Term Sheet.  The amounts set forth in the Confidential Term Sheet represented what she was willing to take for them.  The Blue List Horses were worth whatever a willing buyer agreed to pay, and the Aarons were willing buyers engaged in an arms-length transaction with Rose.

30.     At trial, the Aarons also complained that Rose falsely represented the profitability of her breeding operation by providing them with a doctored profit and loss statement.

31.     The Aarons did not seek a professional assessment of the Profit and Loss Statement they received from Rose's attorney, Stevens.  However, the Aarons assert that they were victims of Rose's fraud and, therefore, they were under no duty to discover the truth by exercising proper

care.  *See Koral Indus. v. Sec.-Conn. Life Ins. Co.,* 802 S.W.2d 650, 651 (Tex. 1990) (disapproving of jury question and instruction which asked whether party acted reasonably in relying on another party's representation); *see also Trenholm v. Ratcliff,* 646 S.W.2d 927, 933 (Tex. 1983) ("Where one has been induced to enter into a contract by fraudulent representations, the person committing the fraud cannot defeat a claim for damages based upon a plea that the party defrauded might have discovered the truth by the exercise of proper care." (internal quotations omitted)).

32.     Here, the Profit and Loss Statement was of limited use to the Aarons.  The Profit and Loss Statement described Rose's business as a going concern, but the Aarons were not seeking to buy the entire business.  They had already rejected Rose's offer to sell her business to them for $20 million when Lewis Stevens sent them the Profit and Loss Statement.  Instead of buying a going concern, as reflected in the Profit and Loss Statement, the Aarons were considering the purchase or lease of certain assets from Rose so that they could take over her place in the performance quarter horse industry.  In this context, they did not rely on the going concern value of Rose's business reflected in the Profit and Loss Statement and, even if they did, the reliance was not justified.

33.     Although the relationship between the Aarons and Rose ended less than three months after the dispersal sale, the speed of the demise does not mean that Rose misrepresented her intentions to the Aarons.  Rather, the Agreements Rose and the Aarons signed did not address with specificity how they would manage the operations of the Gainesville Ranch together.  Rose and the Aarons immediately clashed over financial and operational details, and the business relationship became a brawl.

34.     For the foregoing reasons, the Court concludes that the Aarons failed to establish a claim for statutory fraud or common law fraud.

### 3.      Negligent Misrepresentation

35.     Texas courts have adopted the tort of negligent misrepresentation as formulated in

the RESTATEMENT (SECOND) OF TORTS § 552, which provides, in relevant part:

> One who, in the course of his business, profession or employment, or in any other
> transaction in which he has a pecuniary interest, supplies false information for the
> guidance of others in their business transactions, is subject to liability for pecuniary
> loss caused to them by their justifiable reliance upon the information, if he fails to
> exercise reasonable care or competence in obtaining or communicating the
> information.

*McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 791 (Tex. 1999)

(quoting RESTATEMENT (SECOND) OF TORTS § 552(1) (1977)).

36.     "[N]egligent misrepresentation is a cause of action recognized in lieu of a breach

of contract claim, not usually available where a contract was actually in force between the parties."

*Airborne Freight Corp., Inc. v. C.R. Lee Enters., Inc.*, 847 S.W.2d 289, 295 (Tex. App.—El Paso

1992, writ denied).  To establish a claim for negligent misrepresentation, the plaintiff must prove:

(1) the defendant made a representation in the course of its business or in a transaction in which it

had a pecuniary interest, (2) the defendant supplied false information for the guidance of others in

their business, (3) the defendant did not exercise reasonable care or competence in obtaining or

communicating the information, and (4) the plaintiff suffered pecuniary loss by justifiably relying

on the representation.  *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648,

653–54 (Tex. 2018).

37.     Here, there was an enforceable contract between Rose and the Aarons.  The Aarons,

therefore, do not have a negligent misrepresentation claim against Rose.

38.     Even if the parties had not entered into the Agreements, the Aarons failed to

establish a claim for negligent representation.  The Aarons seek a judgment that Rose is subject to

tort liability for negligently misrepresenting the value of the Blue List Horses, because she failed

to exercise reasonable care or competence in communicating that information to the Aarons. *Cf. McCamish*, 991 S.W.2d at 791. Their contention that the Blue List Horses are worth less than what they paid is based on the appraisal they obtained from Thurow several months after the dispersal sale in connection with the state court action.

39.     During their negotiations, Rose offered her assessment of the value of the Blue List Horses. These were horses that had been bred, cared for, and trained at Rose's facility under her supervision. The Aarons could have obtained their own appraisal of the Blue List Horses but, instead, chose to rely on Rose's assessment of their value

40.     Rose did not seek to prevent the Aarons from obtaining their own appraisal during the negotiations. She did not hide any of the veterinary records from the Aarons. She also did not hide or misrepresent the pedigrees of any of the horses, and she disclosed the ages of the horses, including the mares. The Aarons failed to show how or to what extent the fact that some of the Blue List Horses were owned, or partially owned, by others is relevant to their value.

41.     With respect to the lower prices on some of the Blue List Horses at the production sale, and Rose's inability to sell some of the Blue List Horses at the production sale, the evidence before this Court is that everyone expected the dispersal sale to draw a large, excited crowd. Rose also testified that the production sale was a test of the market and, based on the results, she believed the market for performance quarter horses was improving.

42.     "A party to an arms-length transaction must exercise ordinary care and reasonable diligence for the protection of its own interests, and a failure to do so is not excused by mere confidence in the honesty and integrity of the other party." *Miller Glob. Props., LLC v. Marriott Int'l, Inc.*, 418 S.W.3d 342, 348 (Tex. App.—Dallas 2013, pet. denied).

43.     For all these reasons, the Court concludes that the Aarons failed to establish their claim that Rose negligently misrepresented the value of the Blue List Horses.

### 4.     Breach of Fiduciary Duty

44.     The Aarons also claim that Rose's conduct is a breach of Rose's fiduciary duty to the Aarons.  To prevail on a claim for breach of fiduciary duty under Texas law, the plaintiff must prove that:  (1) there is fiduciary relationship between the plaintiff and defendant; (2) the defendant breached her fiduciary duty to the plaintiff; and (3) the defendan's breach proximately caused injury to the plaintiff or benefit to the defendant.  *Jones v. Blume,* 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied).

45.     As an initial matter, Rose denies that she owes a fiduciary duty to the Aarons.  The Court agrees that she did not owe a fiduciary duty to the Aarons prior to entering into the Agreements.  However, the Consulting Agreement states that Rose "shall be deemed an agent of the Ranch" to the extent such agency is required to carry out the broad range of services described in the contract.

46.     Rose's agency relationship necessarily imposed common law fiduciary duties upon her separate from the contractual duties set forth in the Consulting Agreement.  Agency is "a special relationship that gives rise to a fiduciary duty" under Texas common law.  *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 200 (Tex. 2002).  It is "the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."  RESTATEMENT (THIRD) OF AGENCY § 1.01 (2006).

47.     In addition, Texas courts "have recognized that a duty of good faith and fair dealing may arise as a result of a special relationship between the parties governed or created by a

contract." *Arnold v. Nat'l Cnty. Mut. Fire Ins. Co.,* 725 S.W.2d 165, 167 (Tex. 1987), *modified, Murray v. San Jacinto Agency, Inc.,* 800 S.W.2d 826 (Tex. 1990).[8]

48.     Here, in her capacity as an agent, Rose provided services with respect to the Aaron Ranch.  Those services included supervising the care, breeding, and sale of horses, "contracting with third parties for the provision of veterinarian, farrier, training, and other services," and supervising the general care and upkeep of the Ranch facilities.  In carrying out these services, Rose exercised control over property and funds belonging to Aaron Ranch and represented the Aarons in managing Aaron Ranch employees, dealing with customers, and contracting with third-parties in connection with Ranch operations.  In each of these endeavors, Rose was necessarily an agent acting on behalf of the Aarons and subject to their direction and control.  As such, the Court finds that Rose owed the Aarons a fiduciary duty pursuant to the Consulting Agreement.

49.     The Aarons contend that Rose breached her fiduciary duty to the Aarons by:

(a)     using the Ranch property to promote her own business ahead of Aaron Ranch's business;
(b)     boarding numerous horses at the Ranch at the Aarons' expense – while diverting customer fees that should have gone to the Aarons and refusing to provide complete and accurate customer information or to account to the Aarons for the horses she was keeping or the funds she had collected;
(c)     using Aaron Ranch funds for her personal benefit; and
(d)     intentionally interfering with the business activities of Aaron Ranch employees, including Jay McLaughlin, by removing essential tack from the stable area, filing and serving a frivolous lawsuit against Mr. McLaughlin, all while he was involved in high-profile efforts at the Futurity, a chance for Aaron Ranch to advance its marketability and presence in the equine business.

50.     With respect to (a) – (c), the Aarons' complaints are based in large part on the fact that Rose continued to deal with new and existing clients as if she was still managing the Gainesville Ranch for Carol Rose Quarter Horses.  She continued to answer the business

---

[8] Texas courts "also recognize an informal fiduciary duty that arises from 'a moral, social, domestic or purely personal relationship of trust and confidence.' " *Meyer v. Cathey,* 167 S.W.3d 327, 330–31 (Tex. 2005)   (quoting *Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 287 (Tex. 1998)).

telephones using her own name (rather than the Aaron Ranch), and she did not inform new clients (such as Weston and Williams) that they would be doing business with the Aaron Ranch. She also continued to board horses at the Gainesville Ranch as part of her pre-existing barter arrangements with employees and service providers.

51.    The first day of the Lease, September 1, 2013, was significant to Rose and the Aarons, but not to the general public. Rose's fame had attracted customers to the Gainesville Ranch for many years. Her continued use of her own name and her business name during the immediate transition period is not inconsistent with an intent to introduce the customers Rose had attracted to the Aaron Ranch.

52.    Rose's offer to breed SHINERS LENA DOC for Weston is more troubling. The Consulting Agreement required Rose to promote the Aaron Ranch. Breeding someone else's stud would seem to conflict with her obligations to the Aarons and directly compete against them. Her offer also suggests that she intended to stay in business for herself in the future. However, the breeding season had already ended when Rose spoke with Weston, and Rose did not take any action to promote SHINERS LENA DOC during the time she was acting as a "consultant" for the Aarons.

53.    The business relationship between Rose and the Aarons lasted barely a month. Rose and the Aarons were in litigation by the time Rose could have bred any mare to SHINERS LENA DOC.

54.    With respect to the fact that the invoices to customers for September 2013 were from Carol Rose Quarter Horses rather than the Aaron Ranch, it is not clear from the record whether the Aaron Ranch had the ability to send invoices on its own behalf. Rose was using Blake's proprietary system to generate the invoices and, during September, she repeatedly tried to

convince Lori Aaron that Blake was essential to the business.  Further, Lori Aaron and Rose had not yet worked out the details of how they would handle the income produced by the Gainesville Ranch.

55.     With respect to (d), the Aarons' complaints are based on Rose's removal of the tack she had previously told McLaughlin he could use at the Futurity.  The Court finds and concludes that Rose deliberately attempted to sabotage McLaughlin's performance at the Futurity.  The Court further finds and concludes that Rose's attempted sabotage breached her obligations under the Consulting Agreement.  However, McLaughlin performed well, and the Aarons failed to establish that they suffered any injury as a result of Rose's actions.

56.     For the foregoing reasons, the Court concludes that the Aarons have established a claim for breach of fiduciary duty but that they were not damaged with respect to this claim.[9]

**5.     Civil Conspiracy**

57.     The necessary elements of civil conspiracy are:  (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result.  *Tri v. J.T.T.,* 162 S.W.3d 552, 556 (Tex. 2005).

58.     "Circumstantial evidence may prove the existence of a civil conspiracy and an agreement to cause the injury may be inferred from joint participation in the transactions and from

---

[9] In light of this conclusion, the Court need not address Rose's argument that the Aarons' breach of fiduciary duty claim is barred by the doctrine of "contort."  The doctrine has been described as a "complex and seemingly amorphous rule of law employed by Texas courts" that essentially "bars plaintiffs from bringing tort claims when a contract between the parties defines their relationship."  Erin Hopkins, *Contort vs. Tort: Are We There Yet?*, 49-AUG Hous. Law. 16 (2011).  Here, the Aarons' claim is not simply that Rose failed to perform her contractual obligations under the Consulting Agreement, but that she violated common law fiduciary duties separate from the contractual duties set forth in the Consulting Agreement.  "Accompanying every contract is a common-law duty to perform with care, skill, reasonable expedience and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions is a tort, as well as a breach of the contract."  *Montgomery Ward & Co. v. Scharrenbeck*, 204 S.W.2d 508, 510 (1947).

enjoyment of the fruits of the transactions." *In re Artho*, No. 15-20046-RLJ-12, 2018 WL 1614196, at *10 (Bankr. N.D. Tex. Mar. 30, 2018) (citing *Chu v. Hong*, 249 S.W.3d 441, 444 (Tex. 2008)); *In re Primera Energy, LLC*, 579 B.R. 75, 185 (Bankr. W.D. Tex. 2017) ("A civil conspiracy claim may be proved by circumstantial evidence and reasonable inferences from parties' actions.").

59.     Here, the Aarons contend that Rose, along with her accountant and sometimes business partner, Victor Clark, and her lawyer, Lewis Stevens, devised a scheme for Rose to obtain an immediate influx of cash so that Rose could pay off her debts and continue with her business. In particular, the Aarons contend that Rose, Clark and Stevens  planned the auction and advertised it as a "complete dispersal sale" of her business's assets, knowing that Rose (1) did not intend to sell all of her quarter horses, (2) would be selling many horses that she did not own any interest in at all, including without limitation horses owned by Clark for Clark's significant economic gain, and (3) did not intend to cease operating Carol Rose Quarter Horses as her own business so she could devote her effort, talents, and reputation to the development of the Aaron Ranch brand and its business success.  The Aarons also contend that Rose, Stevens, and Clark determined to exclude from the dispersal sale catalog any information regarding the owner of the horses and instead represent that Rose was the "agent" for all of the horses.

60.     This Court has previously found that Rose intended to substantially go out of business and assist the Aarons in taking over her place in the performance quarter horse industry. Clark assisted Rose in valuing the horses for the auction, and Stevens assisted in preparing the Agreements with the Aarons.

61.     It is not clear why the ownership of the horses would have mattered to the Aarons or other auction attendees.  The value of the horses was based on their pedigrees and their

association with Rose's breeding program, not ownership.  Rose disclosed the pedigrees and health of each horse prior to the auction (or the pre-auction sale to the Aarons).

62.     With respect to the dispersal sale catalog, it is true that Rose did not disclose that she was acting as an agent for the owners of some of the horses such as Clark, McLaughlin and Joos.  However, none of these individuals attempted to run up the prices for their horses by bidding on them.  It appears from the record that the Aarons were the only owners who bid on their own horses at the dispersal sale.

63.     Rose was indebted to both Stevens and Victor Clark (among others) at the time of the auction.  There is no evidence in the record that they received more than what they were owed for their services or, in the case of Clark, on account of his interest in certain horses.

64.     The Court, therefore, concludes that the Aarons failed to show a meeting of the minds by Rose, Clark and Stevens to accomplish an unlawful action with respect to the Aarons.  The Aarons failed to establish a conspiracy and are not entitled to any damages on account of this claim.

### 6.     Tortious Interference with Prospective Business Relations

65.     To prevail on a claim for tortious interference with prospective business relations, the claimant must establish that:  (1) there was a reasonable probability that the claimant would have entered into a business relationship with a third party; (2) the party against whom the action is brought either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the party's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the claimant suffered actual damage or loss as a result.  *Coinmach Corp. v. Aspenwood Apartment Corp.,* 417 S.W.3d 909, 923 (Tex. 2013) (internal citations

omitted).

66.     First, in their proposed conclusions of law, the Aarons ask this Court to conclude that Rose usurped what Weston would have paid them for boarding and other services for the month of September 2013.[10]   As discussed, Rose billed Weston $981 for boarding and other charges for September 2013 and kept the funds.

67.     With respect to the fees Weston paid for September 2013, the Court concludes the boarding fees and charges belonged to the Aarons, because the premises were still under lease to the Aarons.

68.     Second, the Aarons also complain that Rose interfered with their business by dealing directly with Weston with respect to boarding her horses.  The Aarons complain that Rose should have informed them Weston would be a client of Aaron Ranch, not Carol Rose Quarter Horses, and that her failure to do so means that she was taking their business for her own personal benefit.

69.     The business relationship between Rose and the Aarons had just formed when Rose initially dealt with Weston.  Rose and the Aarons were just beginning the process of taking over responsibility for the assets they had purchased or leased from Carol Rose Quarter Horses.  The Aarons were not known in the performance quarter horse industry, and Rose's continued use of her name and her business name during this transition period is not inconsistent with her agreements with the Aarons.

70.     The Court, therefore, concludes that the Aarons failed to establish a claim for

---

[10] In the joint pre-trial order, the Aarons also asked this Court to find that Rose interfered with their business relationship with Kay Williams.  The Aarons did not include this claim in their proposed findings and conclusions of law submitted after trial.  To the extent they have not waived this portion of their claim, the Court finds and concludes that the Aarons failed to show that Rose interfered with their relationship with Williams.  Rather, it appears from the deposition testimony that Williams wanted to get away from the conflict between Rose and the Aarons.

tortious interference with respect to Rose's agreement to board, train, and care for the horses belonging to Weston and Williams.

71.     Third, in their proposed findings of fact and conclusions of law, the Aarons allege that Rose allowed certain friends and service providers (Dr. Katherine Joos, Dr. Dickson Varner, and Eleise Blake) to board their horses at the Ranch, then leased by the Aarons, for no charge whatsoever.  They claim that Rose usurped the compensation they would have received from these individuals by bartering with them for services from which only Rose benefited.  The Aarons seek a conclusion from this Court that Rose's decision to usurp these boarding clients for her own benefit damaged them in the amounts the individuals should have paid Aaron Ranch for services for the month of September 2013.

72.     The Aarons point this Court to some hand-written notes as proof of the lost income. Lori Aaron testified that the writing was hers, but she was unable to clearly articulate which part of the calculations related to the horses owned by Joos, Varner, and Blake. Further, Lori Aaron testified that the numbers were an estimate of what she thought might be owed.

73.     With respect to the horses that Rose kept on the Gainesville Ranch free of charge for certain friends and service providers, the Court concludes that the record fails to establish the lost income for September 2013.

### 7.     Exemplary Damages

74.     The Aarons also seek exemplary damages pursuant to the Texas Civil Practice & Remedies Code § 41.001 *et seq*.  The term "exemplary damages" means any damages awarded as a penalty or by way of punishment but not for compensatory purposes. Exemplary damages are neither economic nor noneconomic damages.  TEX. CIV. PRAC. & REM. CODE § 41.001.

75.     An award of exemplary damages may be appropriate where the claimant proves

that its harm resulted from fraud, malice, or gross negligence. TEX. CIV. PRAC. & REM. CODE § 41.003.[11] However, in any particular case, "the determination of whether to award exemplary damages and the amount of exemplary damages to be awarded is within the discretion of the trier of fact." TEX. CIV. PRAC. & REM. CODE § 41.003.

76.     Here, as previously discussed, the Aarons failed to establish that Rose knowingly made false statements to them, which reasonably induced the Aarons to enter into the various transactions with Rose, which Rose never had the intention of performing  The Court, therefore, concludes that the Aarons failed to establish grounds for an award of exemplary damages.

### 8.     **Violation of the Theft Liability Act**

77.     Under the Texas Theft Liability Act ("TTLA"), a person who commits theft is liable for damages resulting from the theft. *Beardmore v. Jacobsen,* 131 F. Supp. 3d 656, 669 (S.D. Tex. 2015) (citing TEX. CIV. PRAC. & REM. CODE § 134.002(3)). "The TTLA provides victims of a theft, as defined in various sections of the Texas Penal Code, with a civil action to recover damages, fees, and costs from the thief." *In re Powers,* 261 F. App'x 719, 721 (5th Cir. 2008). A "person who has sustained damages resulting from theft may recover ... the amount of actual damages found by the trier of fact and, in addition to actual damages, damages awarded by the trier of fact in a sum not to exceed $1,000." *Beaumont v. Basham*, 205 S.W.3d 608, 618-19 (Tex. App.—Waco 2006) (citing TEX. CIV. PRAC. & REM. CODE § 134.005(a)(1)).

---

[11] The Aarons also seek damages based on fraud with respect to a real estate transaction. In particular,

> A person who (1) has actual awareness of the falsity of a representation or promise made by another person and (2) fails to disclose the falsity of the representation or promise to the person defrauded, and (3) benefits from the false representation or promise commits the fraud described in Subsection (a) of this section and is liable to the person defrauded for exemplary damages. Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

TEX. BUS. & COMM. CODE § 27.01(d). The Aarons, however, fail to explain how this statute applies to this case. They have not alleged or sought to establish that Rose was aware of the falsity of a representation made by another person.

78.     Here, the Aarons contend that Rose violated the TTLA by locking them out of the Gainesville Ranch.  The Aarons seek to recover as damages the amount they spent to upgrade the Aaron Ranch after Rose locked them out of the Gainesville Ranch.

79.     The TTLA defines "theft" by incorporating portions of the Texas Penal Code by reference.  *See* TEX. CIV. PRAC. & REM. § 134.002(2) (defining "theft" by incorporating portions of the Texas Penal Code by reference).  In the context of real property, a person commits theft when he appropriates property by "bring[ing] about a transfer or purported transfer of title to or other nonpossessory interest in property, whether to the actor or another …."  TEX. PENAL CODE § 31.01(4)(A).  Importantly, "appropriate" does not mean "to acquire or otherwise exercise control over property" in the context of a claim of theft of real property.  *Id.* at §31.01(4)(B).

80.     The Court, therefore concludes that the Aarons failed to establish that Rose violated the TTLA by locking them out of the Gainesville Ranch.

81.     The Aarons also contend that Rose violated the TTLA by extracting money from them in the guise of a stableman's lien.[12]  After she locked out the Aarons, Rose began charging them for boarding and caring for their horses on the Gainesville Ranch.  She asserted a stableman's lien against the horses far in excess of what she was due under applicable law.  *See* TEX. PROP. CODE § 70.003(a) – (b) (providing a stable keeper with a lien for charges for the care of an animal and providing an owner of a pasture with a lien for charges for grazing).  However, the total for charges for the care and grazing of the Aarons' animals was only $40,691.18.  The balance that Rose demanded from the Aarons ($61,257.32) represented the amounts that Rose felt she was

---

[12] In her closing trial brief, Rose asserts that the stableman's lien issue was settled when she and the Aarons entered into a Partial Settlement and Mutual Release Agreement effective July 8, 2014 with respect to the Red List Horses.  The Red List Horses were among those at the Gainesville Ranch when Rose demanded payment of what she described as a stableman's lien.  The basis for the assertion that the stableman's lien issue was settled is not clear from the record.  In their proposed findings and conclusions submitted after trial, the Aarons request reimbursement for the excess amounts Rose demanded for the release of the stableman's lien.

owed due to her agreements with the Aarons.  Thus, the Aarons contend that Rose effectively stole $61,257.32 ($101,948.50 - $40,691.18) from them.

82.     One appropriates property under § 31.03(a) of the Penal Code if one "acquire[s] or otherwise exercise[s] control over property other than real property." TEX. PENAL CODE § 31.01(4)(B).  Appropriation of property is unlawful if it is "without the owner's effective consent." TEX. PENAL CODE § 31.03(b)(1).  Consent is not effective if the consent is "induced by deception or coercion." TEX. PENAL CODE § 31.01(3)(A).  "Deception" means "creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true." TEX. PENAL CODE § 31.01(1)(A).

83.     Here, Rose's attorney sent a letter to the Aarons' attorney asserting a stableman's lien in the total amount of $101,948.50.  He attached a detailed list of the charges.  It was clear from the list that not all of the charges related to the care and grazing of the Aarons' horses.  Although Rose demanded that the Aarons to pay the entire $101,948.50 before she would release any of their horses from the Gainesville Ranch, she did not deceive them as to the nature of the charges included in her so-called "stableman's lien."

84.     In their post-trial brief, the Aarons describe the purported stableman's lien as a "ransom" demand.  They argue that Rose coerced them into paying her what she claimed she was owed by refusing to release their horses and by continuing to charge them for caring for the horses that she refused to release.

85.     The Court concludes that, under the circumstances, Rose violated the TTLA and coerced payment by depriving the Aarons of their horses until they agreed to pay her everything she demanded.  She did not deceive the Aarons as to the fact that she was demanding $61,257.32 over-and-above the amounts related to the care and grazing of their horses, but she coerced them

to pay the full amount she believed she was owed under the Agreements by refusing to release their horses from the Gainesville Ranch.

86.     Finally, in the joint pre-trial order, the Aarons contend that Rose violated the TTLA by agreeing to board Weston's horses and breed SHINERS LENA DOC without consulting them and without any payment to the Aarons.  This contention does not appear to implicate the TTLA. The Court addresses the Aarons' contentions regarding Rose's dealings with Weston in connection with their tortious interference claims.

9.     **Equitable Remedies**

a.     **Equitable Subrogation**

87.     Rose used a portion of the money the Aarons paid to her prior to the dispersal sale to pay off Rose's secured debt.  The Aarons seek to step into the shoes of Rose's secured creditors with respect to those debts.

88.     Texas law has recognized the doctrine of equitable subrogation for over a century. *See Faires v. Cockrill*, 31 S.W. 190, 194 (Tex. 1895) ("Perhaps the courts of no state have gone further in applying the doctrine of subrogation than has the court of this state...").  The purpose of equitable subrogation is to prevent unjust enrichment of the debtor.  *First Nat'l Bank of Kerrville v. O'Dell*, 856 S.W.2d 410, 415 (Tex. 1993); *Smart v. Tower Land & Inv. Co.*, 597 S.W.2d 333, 337 (Tex. 1980).  In the context of secured debt, the party paying the debt is subrogated to the liens and priorities of the original lienholder to the extent of the debt paid, and, to the extent necessary for full justice to be accomplished between the parties, equity will treat the original liens as subsisting.  *Faires*, 31 S.W. at 194.

89.     The two key elements of equitable subrogation are: (1) that the party on whose behalf the claimant discharged a debt was primarily liable on the debt; and (2) that the claimant

paid the debt involuntarily. *See* 68 TEX. JUR. 3d., *Subrogation*, § 11. With respect to the involuntariness of payment, the doctrine of equitable subrogation "is not applied for the mere stranger or volunteer who has paid the debt of another, without any assignment or agreement for subrogation, without being under any legal obligation to make payment, and without being compelled to do so for the preservation of any rights or property of his own." *First Nat'l Bank of Kerrville,* 856 S.W.2d at 415.

90.      Here, the Aarons' request for equitable subrogation is premised on their claim that Rose fraudulently induced them to enter into the Agreements with her, and buy the Blue List Horses, so that she could use their money to pay her creditors.  The Aarons seek a secured claim in the amount of $1,558,018.85, which is the amount Rose paid to Texas Star Bank and Paul Violich to pay off her debts to them.  The Court, however, has concluded that the Aarons failed to establish any fraudulent inducement by Rose.  The Court concludes that the Aarons likewise failed to establish grounds for equitable subrogation.

### b.      Declaratory Relief

91.      The Aarons ask this Court to declare "the rights of the parties under the Lease, the Consulting Agreement, and the Confidential Term Sheet, consistent with the Court's findings herein, including but not limited to, whether Rose possesses the requisite mental capacity to perform her duties under the Consulting Agreement."

92.      When a Texas Declaratory Judgment Act ("DJA") suit is removed to federal court, it will be treated as though it had been originally filed under the Federal DJA. *See Wells Fargo Bank, N.A. v. American Gen. Life Ins. Co.,* 670 F.Supp.2d 555, 565 (N.D. Tex. 2009) ("Because the Texas [DJA] is procedural in nature, it does not govern a declaratory judgment action in federal court."); *Ondova Ltd. Co. v. Manilla Indus., Inc.,* 513 F.Supp.2d 762, 776 n. 12 (N.D. Tex.

2007) ("When a declaratory judgment action filed in state court is removed to federal court, that action is in effect converted into one brought under the ... [Federal DJA].").  Unlike the Texas DJA, the Federal DJA does not provide for the recovery of legal fees and expenses. *Mercantile Nat'l Bank v. Bradford Trust Co.* 850 F.2d 215, 218 (5th Cir. 1988) (The Federal DJA "does not by itself provide statutory authority to award attorney's fees....").

93.     Where a party seeks declaratory relief and a substantially similar alternative remedy, a court may exercise its discretion to dismiss the declaratory judgment claim prior to trial.  *See Torch, Inc. v. LeBlanc*, 947 F.2d 193, 194 (5th Cir. 1991).  Here, any issue regarding contract interpretation was resolved as part of the breach of contract claim.  Accordingly, the Court concludes that the Aarons failed to establish grounds for a declaratory judgment regarding the contractual rights of the parties.  *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995).

### c.     Accounting

94.     The Aarons seek an accounting of "all financial transactions and operations conducted by Rose since August 30, 2013, until the time of trial pertaining in any way to any equine business."  Their request is not based on a written agreement, but upon equity.

95.     Under Texas law, an action for accounting may be founded in equity.  *T.R.W. Management, Inc. v. Westwood Shores Property Owners Ass'n,* 79 S.W.3d 712, 717 (Tex. App.—Houston [14th Dist.] 2002, pet. denied).  Such a remedy is proper when the facts and accounts presented are so complex that adequate relief may not be obtained at law. *Hutchings v. Chevron U.S.A.,* 862 S.W.2d 752, 762 (Tex. App.—El Paso 1993, writ denied) (citing *Richardson v. First Nat'l Life Ins. Co.,* 419 S.W.2d 836, 838 (Tex. 1967).  When a party can obtain adequate relief at law through the use of standard discovery procedures, such as requests for production and interrogatories, a trial court does not err in not ordering an accounting. *T.F.W.,* 79 S.W.3d at 718.

96.     Here, the Aarons and Rose engaged in extensive discovery over four years.  They submitted thousands of exhibits for trial, including Rose's general ledger and bank records.  The Aarons failed to show that discovery was inadequate or that equitable grounds exist for an accounting.

### B.     McLaughlin's Claims Against Rose

97.     As previously discussed, McLaughlin filed three unsecured claims against Rose's bankruptcy estate -- claim numbers 13-1, 14-2 and 15-1.  Rose objects that his claims are barred by the applicable statute of limitations, among other things.

98.     Bankruptcy Code § 502(a) provides:

> A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.

11 U.S.C. § 502(a).  If an objection to a claim is filed, § 502(b)(1) directs the Court to determine the amount of and allow such claim "except to the extent that such claim is unenforceable against the debtor ... under any agreement or applicable law ..." 11 U.S.C. § 502(b)(1).

99.     Bankruptcy Rule 3001 governs the requirements for a proof of claim, including that the proof of claim be in writing and substantially conform to the appropriate official form.  Subsection (c) sets forth the supporting information required for various types of claims.  Subsection (f) provides: "A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."  FED. R. BANKR. P. 3001(f).

100.    Here, McLaughlin filed his claims against Rose using the official proof of claim forms.  With respect to claim numbers 14-2 and 15-1, these claims assert amounts due and owing that stem from the dispersal sale that took place on August 16, 2013.  Under Texas law, the statute

of limitations for a cause of action related to debt that is allegedly owed is four years. Thus, according to Rose, the limitations period had expired when she filed her bankruptcy petition on September 18, 2017.

101. McLaughlin responds that limitations was tolled pursuant to TEX. CIV. PRAC. & REM. CODE § 16.063 during the periods of Rose's absence from Texas. In particular, McLaughlin relies upon Rose's testimony that, following the dispersal sale, she was out of Texas at several horse shows in California, Oklahoma City, and Arizona and she also traveled to the Cayman Islands for a vacation.

102. Section 16.063 provides that "the absence from this state of a person against whom a cause of action may be maintained suspends the running of the applicable statute of limitations for the period of the person's absence." TEX. CIV. PRAC. & REM. CODE § 16.063. However, Texas courts have held that brief travels outside of Texas during the limitations period do not trigger § 16.063. *See, e.g., Liptak v. Brunson*, 402 S.W.3d 909, 903 (Tex. App.—Dallas 2013, no pet.); *Zavadil v. Safeco Ins. Co. of Illinois*, 309 S.W.3d 593, 596 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).

103. The Court, therefore, concludes that McLaughlin did not assert claim numbers 14-2 and 15-1 within the four-year statute of limitations and, therefore, these claims are time-barred. In light of the Court's conclusion, the Court need not address Rose's other objections to claim numbers 14-2 and 15-1.

104. With respect to McLaughlin's claim number 13-1, McLaughlin complains that Rose has failed and refused to sign the breeder certificates necessary to register two fillies sired by A SHINER NAMED SIOUX. McLaughlin asserts damages in the amount of $51,200, which is

the diminished value of the fillies as a result of McLaughlin's inability to register the fillies with the AQHA.

105.    The basis of McLaughlin's claim number 13-1 appears to be his allegation that part of the agreement whereby Rose allowed him to breed two horses from A SHINER NAMED SIOUX was her promise or agreement that she would sign the breeder certificates necessary to register the product of the breeding with the AQHA and that she has failed and refused to carry out her promise, thereby damaging McLaughlin.  *See Underwood v. Williams*, 488 S.W.2d 515, 518 (Tex. Civ. App. 1972) (describing a similar claim).

106.    The Texas Statute of Frauds does not apply to an agreement that is to be performed within one year.  *See* TEX. BUS. & COMM. CODE § 26.01(b)(6).  The bases for the McLaughlin claims are oral agreements that were to be performed within one (1) year.  The Court, therefore, concludes that claim number 13-1 is not barred by the Texas Statute of Frauds.

107.    With respect to McLaughlin's claim number 13-1, Rose did not establish the limitations period for the delivery of an AQHA breeder certificate.  Further, Rose did not establish when a breeder certificate could or should have issued with respect to the two fillies.  The Court, therefore, concludes that Rose failed to establish that claim number 13-1 is barred by limitations.

108.    McLaughlin testified as to the decrease in the value of the two fillies caused by Rose's failure and refusal to sign the breeder certificates.  McLaughlin also testified that he has complained to the AQHA, but that his horses remain unregistered.  The Court finds and concludes that his testimony was credible and sufficient to establish his damages.  Rose did not submit any evidence contradicting his testimony.  Indeed, the evidence at trial establishes that registration papers are integral to the value of Rose's horses and their progeny and that Rose has charged extremely high prices for many of the horses sired by A SHINER NAMED SIOUX.

109.    The Court, therefore, concludes that McLaughlin established an unsecured claim against Rose in the amount of $51,200 and Rose's objections to the allowance of claim number 13-1 should be overruled.

### C.    Rose's Claims Against the Aarons

### 1.    Breach of Contract

110.    Rose claims that the Aarons breached the Lease, Consulting Agreement and Confidential Term Sheet.  In the parties' joint pre-trial order, Rose specifically claims that the Aarons breached these Agreements by: (i)  failing to pay lease payments; (ii)  failing to pay for maintenance, repairs, and expenses; (iii) failing to provide and pay for board and training; (iv) failing to pay Rose a 10% commission on horse sales; (v) failing to provide lifetime breeding rights  to A SHINER NAMED SIOUX; (vi)  failing to  provide lifetime breeding rights to BLINDSIDED; (vii) failing to replace equipment; (viii) failing to pay taxes; (ix) failing to transfer utility accounts and pay utilities; (x) failing to secure, maintain and pay for insurance; (xi) failing to take reasonable action to aid Rose; and (xii) failing to pay for tack purchased at the dispersal sale.

111.    Rose claims that the Lease did not terminate until her letter dated January 15, 2014. She seeks to recover $158, 601 for lease payments and $62,662 for the expenses relating to the operation of the Gainesville Ranch (maintenance, taxes, utilities and insurance) from October through January for a total award of $221,263.[13]  Rose also seeks to recover what she would have received from the Aarons for training and boarding four of their performance horses and boarding three mares in the total amount of $29,938.

---

[13] Rose's expert, Karl D. Weisheit, submitted a report calculating her alleged damages.  His report of included $262,180 in operating expenses for the Gainesville Ranch.  However, in her closing brief, Rose requests an awarded of damages in the amount of $62,662 for operating expenses.  The amount Rose is seeking for operating expenses appears to credit the Aarons for the $101,948.50 they paid Rose on account of the purported stableman's lien.

112.    Rose also seeks to recover $35,000 for breedings to A SHINER NAMED SIOUX and BLINDSIDED.  The Confidential Term Sheet provided for 10 breedings to each stallion over a five year period, and Rose alleges that the value of such breedings is $35,000 based on the stud fees charged for each horse.

113.    The evidence submitted at trial establishes that the Aarons paid the rent due under the Lease for September 2013.  Rose and Lori Aaron immediately began clashing over the mundane details of operating the Gainesville Ranch – such as how to answer the telephone.  Rose sent the Aarons a notice of default dated September 20, 2013.  The Aarons responded with their own notice of default to Rose on September 24, 2013, and they tendered the amount due under the Lease for October 2013 to Rose's attorney while they worked through the disputes they had with Rose at that time.

114.    This Court has already determined that Rose breached the Lease, Consulting Agreement and Confidential Term Sheet by locking the Aarons out of the Gainesville Ranch on October 3, 2013, without allowing them the appropriate cure period under the Lease.

115.    Further, to the extent Rose contends that she did not terminate the Lease until January 15, 2014, Rose violated her obligations to the Aarons under the Agreements by resuming her business and directly competing against the Aarons after locking them out of the Ranch on October 3, 2013.

116.    The fact that the Aarons had not yet transferred utility accounts and insurance policies to the Aaron Ranch by mid-September does not establish that they never intended to perform under the Agreements.  Rose and the Aarons were busy preparing for the Futurity throughout early September.  Further, the office manager Rose hired for the Gainesville Ranch left for several weeks beginning in mid-September to attend the Futurity, and Rose's bookkeeper,

Eleise Blake, attended the Futurity as well.  Lori Aaron paid the bills Rose sent her, she deposited $45,000 into the operating account for the Gainesville Ranch, she allowed Rose check writing authority (at least until Rose wrote a second check to herself for cash), and she was making lists of operational issues to talk about with Rose.

117.    "A breach of contract occurs when a party fails to perform an act that it has expressly or impliedly promised to perform."  *Case Corp. v. Hi–Class Bus. Sys. of America, Inc.*, 184 S.W.3d 760, 769-70 (Tex. App.—Dallas 2005, pet. denied).  A material breach by one party to a contract can excuse the other party from any obligation to perform. *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) (per curiam) ("It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance."); *Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994).

118.    Here, Rose's breach of the Lease, Consulting Agreement and Confidential Term Sheet excused the Aarons from any obligation to perform.  *Mustang Pipeline Co.*, 134 S.W.3d at 196.  The Court, therefore, concludes that Rose failed to establish a claim against the Aarons for breach of the Lease, Consulting Agreement, and Confidential Term Sheet.

### 2.    Fraudulent Inducement to Enter into an Agreement with Respect to Certain Horses

119.    In the parties' joint pre-trial order, Rose claims that the Aarons fraudulently induced her to enter into the Confidential Term Sheet by misrepresenting that she would receive two annual breedings from A SHINER NAMED SIOUX and BLINDSIDED.  Rose seeks $35,000 in damages as a result of the alleged fraudulent misrepresentation.

120.    In her post-trial closing brief, Rose seeks to recover $35,000 in breeding fees as part of her breach of contract claim.  Rose does not ask this Court to find or conclude that she was

fraudulently induced to enter into the Consulting Agreement.  To the extent Rose has not waived her fraudulent inducement claim, the Court finds that Rose failed to establish that the Aarons breached the Agreements or that the Aarons fraudulently induced Rose with respect to the Agreements.  The Court, therefore, concludes that Rose failed to establish a claim for fraudulent inducement with respect to the Confidential Term Sheet.

### 3.      Fraudulent Inducement to Enter into the Lease

121.    Rose claims that at the time the parties entered into the Lease, the Aarons never intended to comply with its terms and conditions.  In support of her claim, Rose testified that the Aarons did not immediately take sufficient steps to take over utilities or insurance for the property.  However, as explained above, Rose filed a lawsuit alleging those technical breaches before the cure period had run.

122.    Moreover, Lori Aaron testified, credibly, that she had expected that the new office manager Rose had hired would provide her with the necessary information and assist in the transfer of utilities and insurance to Aaron Ranch.  Further, the trial record reflects that the Aarons were preparing to operate their new performance quarter horse business from the Gainesville Ranch, including placing their newly purchased Blue List Horses at the Ranch following the auction, taking over payroll for Ranch employees, purchasing expensive equipment requested by Rose, and preparing the employees for and funding the Futurity, among other tasks.

123.    The Court finds that the credible evidence admitted at trial establishes that the Aarons intended to perform under the Agreements and that there was no fraudulent inducement by the Aarons.  As a result, Rose's fraudulent inducement claim against the Aarons fails, and she is entitled to no damages on account of this claim.

### 4.    Damages and Equitable Relief

#### a.    Exemplary Damages

124.    The Aarons did not engage in any conduct that would merit the award of exemplary damages under Texas.   *See* TEX. CIV. PRAC. & REM. CODE § 41.003 (generally providing that exemplary damages may be awarded based on clear and convincing evidence of fraud, malice or gross negligence).

#### b.    Attorney's Fees

125.    Rose is not entitled to the reasonable and necessary attorneys' fees, *see* TEX. CIV. PRAC. & REM. CODE § 38.001 *et seq.* or TEX. CIV. PRAC. & REM. CODE § 134.005(b), because reasonable and necessary attorneys' fees are only available to the prevailing party.    For the reasons outlined above, Rose did not prevail on her claims against the Aarons or the Aarons claims against her.

### 5.    Disallowance of the Aarons' Claims Under 11 U.S.C. § 502

126.    The Aarons filed four proofs of claim against Carol Rose in Case No. 17-42053, specifically, claim numbers 9, 10, 11 and 12 in unliquidated amounts.  The Aarons filed two proofs of claim against Carol Rose, Inc. in Case No. 17-42058, specifically, claim numbers 4-5 in unliquidated amounts.

127.    The Aarons filed their claims using the official proof of claim form.

128.    Claim numbers 10, 11, and 12 filed in Carol Rose's bankruptcy case are duplicative of claim number 9.  These claims, therefore, should be disallowed as duplicative claims.

129.    Claim number 5 filed in Carol Rose, Inc.'s bankruptcy case is duplicative of claim number 4.  This claim, therefore, should be disallowed as a duplicative claim.

130.    In their proofs of claim (claim number 9 in Carol Rose's bankruptcy case and claim number 4 in Carol Rose, Inc.'s bankruptcy case), the Aarons are jointly asserting an unliquidated claim against Carol Rose and Carol Rose, Inc., jointly and severally, based upon the Aarons' counterclaim filed against Carol Rose and Carol Rose, Inc. in state court.

131.    Joint and several liability is not an independent cause of action, but rather a description of the extent of an individual defendant's own substantive liability for the harm that is caused by the individual defendant together with others.  *De La Cruz v. Kailer*, 526 S.W.3d 588, 592 (Tex. App.—Dallas 2017, pet. ref'd).  Here, Carol Rose was the president and sole owner of Carol Rose, Inc., dominated its operations, guaranteed its obligations to Texas Star Bank, and, with respect to the Aarons, entered into joint promises with Carol Rose, Inc. in connection with the Confidential Term Sheet and Lease.  Thus, there is a basis for holding Carol Rose and Carol Rose, Inc. jointly and severally liable to the Aarons.

132.    Based upon this Court's findings of fact and conclusions of law, Rose's objections to the Aarons proofs of claim are sustained in part and overruled in part.  The Aarons have established an unsecured claim against Carol Rose and Carol Rose, Inc., jointly and severally, in the total amount of $1,109,000 for breach of contract, plus $61,257.32 for Rose's violations of the TTLA, plus reasonable attorneys' fees in an amount to be determined by this Court.

## D.    Weston's Claims Against Rose

### 1.    "Puff" Bidding and Liability under Texas Business and Commerce Code § 2-328

133.    First, Weston contends that Rose violated Texas law by using the Aarons as "puff" bidders in order to deceive the auction attendees, including Weston.  "Puffing" is a practice where a person bids for the purpose of inflating the value of the property on behalf of those interested in the sale, with an undisclosed understanding with the seller that the bidder or "puffer" will not be

held liable for his bids.  *See McMillan v. Harris*, 110 Ga. 72, 35 S.E. 3341335 (Ga. 1900) (discussing history of fraud in auctions).  "Puffing" is considered fraud.  *Id.*

134.    Because of their special nature, auction sales are treated separately under the Texas Uniform Commercial Code ("UCC"), primarily to define the moment at which a binding contract of sale is formed and to specify when goods or bids may be withdrawn without liability.  *See* 12 TEX. PRAC., *Texas Methods of Practice* § 25:43 (3d ed. 2018).

135.    Sales of goods by auction are governed by Texas UCC § 2.328.  Section 2.328 provides in pertinent part that "[1] if the auctioneer knowingly receives a bid on the seller's behalf or the seller makes or procures such a bid, and [2] notice has *not* been given that liberty for such bidding is reserved, [3] the buyer may at his option avoid the sale or take the goods at the price of the last good faith bid prior to the completion of the sale."  *Id.* § 2.328(d) (emphasis added).

136.    The purpose of this provision, as noted by the Supreme Court of North Dakota when construing its state's identical provision, is to "protect the buyer from a seller who artificially inflates the price of goods being auctioned.  If the seller wishes to bid on [her] own goods, [s]he must disclose this fact."  *See Berg v. Hogan*, 311 N.W. 200, 203 (N. Dakota 1981).  As a result, the provision should be construed liberally in favor of requiring a seller to disclose they are bidding and for whom.  *Id.*

137.    Here, Rose and the auctioneers knew, but did not disclose to the auction attendees or the public, including Weston, that Rose had agreed to sell many of her best horses to the Aarons. The Aarons, who had already paid Rose for 39 of the 144 horses that went through the auction, were actively bidding throughout the auction in order to "win" the horses and obtain their registration papers as required by the Confidential Term Sheet.  Rose used the Aarons to excite

other bidders so that the horses she had not already sold to the Aarons would fetch the "reserve" prices she had secretly placed on many of them.

138.    At trial, Lori Aaron candidly admitted that as a by-product of the Confidential Term Sheet, the Aarons were "puff" bidding at the 2013 dispersal sale.

139.    With respect to SHINERS LENA DOC, the Aarons' last bid was $150,000, which was the price on the Blue List.  The Aarons, erroneously prompted by Lewis Stevens, stopped bidding at $150,000.  Weston continued to bid for the stallion and, eventually, won him for $190,000.

140.    Although Rose stood at the front of the auction and did not bid on any horses, she effectively required the Aarons to do so on her behalf through the terms of the Confidential Term Sheet.  Rose benefited from the inflated price Weston paid for SHINERS LENA DOC.

141.    For all of these reasons, the Court concludes that Rose and her agents engaged in "puffing," which triggered Texas UCC § 2.328.

142.    With respect to SHINERS LENA DOC, the remedy Weston requests is rescission of the sale.  Weston's request to return SHINERS LENA DOC to Rose in exchange for the $190,000 she paid for that horse at the auction is discussed below.

### 2.    Deceptive Advertisements and Texas Administrative Code § 67.70

143.    Next, in support of her other claims, Weston contends that the auction was tainted by Rose's secret use of reserves.  Rose responds that there was no secret to her use of reserve prices at the auction.  She argues that her "complete dispersal sale" was with reserve as a matter of law based on the language of the dispersal sale catalog.  Rose thereby seeks to distinguish her "complete dispersal sale" from an "absolute auction."

144.     The content of auction advertisements is governed by Chapter 67 of the Texas Administrative Code.  The version of Chapter 67 applicable to the issues in the case was effective from December 1, 2006, through December 31, 2013.

145.     Chapter 67 provided in pertinent part: "If an auctioneer advertises an auction as 'absolute' or 'without reserve', no lots included may have a minimum bid. Advertising may include the wording, 'many lots are without reserve'; however, the auction may not be titled, headed or called an 'absolute' or 'without reserve' auction unless all lots meet that criteria." § 67.70(f). Requirements--Auctioneer, 16 TX ADC § 67.70.

146.     An "absolute auction" is an auction where there are no minimum prices and no reserves.  *See Pitchfork Ranch Co. v. Bar TL*, 615 P.2d 541, 543 n.5 (Wyo. 1980) (recognizing auctioneer's understanding of the meaning of the term "absolute auction"); *see also Marten v. Staab*, 537 N.W.2d 518, 525 (Neb. Ct. App. 1995), aff'd, 543 N.W.2d 436 (Neb. 1996) (describing an "absolute" auction as an auction "without reserve").  In an "absolute auction" the items being auctioned will be sold to the highest bidder.  *Id.* at 523.  This principle is codified in Texas Administrative Code § 67.10(3), which defines an "auction without reserve" or "absolute auction" as "[a]n auction in which property put up for sale is sold to the highest bidder, where the seller may not withdraw the property from the auction after the auctioneer calls for bids unless no bid is made in a reasonable time, and where the seller may not bid himself or through an agent."

147.     Chapter 67 does not define the term "dispersal sale."  The term "dispersal sale" is sometimes used to describe the sale of livestock of a farmer or livestock breeder who is discontinuing business.  *See* WYO. STAT. ANN. § 11-22-101(a)(iii)(A) ("'Livestock market' means a place operated for profit as a public market . . . in which livestock are received, held for sale, sold or offered for sale at either public auction or private sale, except that this act does not apply

to . . . [a]ny place used solely for a dispersal sale of the livestock of a farmer, dairyman, livestock breeder or feeder who is discontinuing business . . . ."); *see also* IDAHO ADMIN. CODE R. 35.01.02.134 (in a statute addressing the exempt sales of livestock, "Those groups expressly exempted from chartering requirements are . . . [a]ny place or operation conducted for a dispersal sale of the livestock of a farmer, dairyman, livestock breeder, or feeder who is discontinuing said business and no other livestock is sold or offered for sale.").

148.    The common meaning ascribed to the words shows that "absolute" is synonymous with "complete," and a reasonable person would interpret a "complete dispersal sale" to mean an "absolute dispersal sale."  *See* Absolute, BLACK'S LAW DICTIONARY (6th ed. 1990) (absolute means "complete"); *see also* Complete, MERRIAM-WEBSTER ONLINE DICTIONARY 2018, available at http://www.merriam-webster.com (25 May 2018) (complete means "total, absolute").

149.    The auction expert for the Aarons, Mr. Mike Brandly, testified that Rose's advertisements gave the impression that the "complete dispersal sale" was an "absolute auction." He opined that to advertise a sale as complete and then not conduct it that way is a "massive and egregious" problem.

150.    Other witnesses, including Eleise Blake, Trey Neal, and Jay McLaughlin, equated a "complete dispersal sale" with an auction in which a high bidder wins with no reserve.

151.    Nonetheless, Rose asserts that her use of reserves was authorized based on a single sentence in the dispersal sale catalog that states: "The right to bid is reserved for all consignors unless otherwise announced."

152.    The 2006 version of § 67.70 explicitly prohibits a party, like Rose, from misleading the public by concealing inconsistent auction terms in fine print.  The 2006 version of § 67.70 contained the following auction requirement that is absent from the current version:

(i) Any statement in an advertisement for an auction that alters the meaning of another statement in the advertisement must be in a type font at least as large as the type font of the statement it alters.

153.     Apart from subsection (i) and a few other differences, the 2006 and current versions of § 67.70 are otherwise identical.

154.     The Court concludes that Rose failed to comply with the 2006 version of § 67.70. Rose advertised the 2013 dispersal sale as a "complete" sale of her horses and equipment.  The advertised "complete" or "absolute" nature of the dispersal sale is inconsistent with Rose's use of reserves.  Moreover, Rose cannot rely on an inconsistent statement buried on page 14 and typed in small print, because any alleged statements that the "complete dispersal sale" was conducted with a reserve were not nearly in the same font and font size as the advertised statements that the dispersal sale was a complete sale of Rose's horses and equipment.

155.     Thus, as Brandly explained, it was "otherwise announced" that there would be no reserve.  In fact, it was otherwise announced in large prominent bold letters in the sale catalog through the repeated use of the term "complete dispersal sale."  This general announcement was reinforced by the specific announcement that the last horse of the day, YURS AND MINE, was the only horse with a reserve.

156.     Even if the current of the version of § 67.70 was applicable, Rose also failed to comply with the standards of practice applicable to conducting an auction.  In fact, the current language broadly prohibits all "misleading" statements which certainly encompasses Rose's actions.  Specifically, Rose, directly and through her agents, made false and misleading statements in their advertisements and sale catalog in violation of § 67.70(a)(4).

157.     The Court, therefore, concludes that advertising an auction as a "complete dispersal sale" but then conducting such an auction "with reserves" was deceptive to the public, including

Weston.  Although Chapter 67 does not contain a private right of action or remedy for Weston, the Court's conclusion is relevant to Weston's remaining claims against Rose.

### 3.  Common Law Fraud, Fraudulent Inducement, Fraud by Non-Disclosure

158.  As previously discussed with respect to the Aarons' claims against Rose, a fraud claim requires proof that a party: (1) made a material representation that was false, (2) knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth, (3) intended to induce the other party to act upon the representation, and (4) the other party actually and justifiably relied on the representation and suffered an injury. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001).

159.  Fraudulent inducement is a subtype of fraud for when a party has been fraudulently induced into entering into a contract. *Haase v. Glazner*, 62 S.W.3d 795, 797-98 (Tex. 2001) (recognizing that fraudulent inducement requires that "a party has been induced to enter a contract"); *accord Wilmont v. Bouknight*, 466 S.W.2d 219, 277 (Tex. App.—Houston [1st Dist.] 2015, pet denied) (holding fraudulent inducement is a particular type of a fraud that arises only in the context of a contract).  An essential element of a fraudulent inducement claim is "proof that a party relied to its detriment on an alleged misrepresentation." *Haase*, 62 S.W.3d at 798.

160.  Fraud by nondisclosure is another subcategory of fraud. *Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 181 (Tex. 1997). To establish fraud by nondisclosure, a claimant must prove (1) the defendant failed to disclose facts to the plaintiff, (2) the defendant had a duty to disclose those facts, (3) the facts were material, (4) the defendant knew the plaintiff was ignorant of the facts and the plaintiff did not have an equal opportunity to discover the facts, (5) the defendant was deliberately silent when it had a duty to speak, (6) by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting, (7) the

plaintiff relied on the defendant's nondisclosure, and (8) the plaintiff was injured as a result of acting without that knowledge. *Horizon Shipbuilding, Inc. v. Blyn II Holding, LLC,* 324 S.W.3d 840, 850 (Tex. App. -- Houston [14th Dist.] 2010, no pet.).

161.    Here, as previously discussed, the dispersal sale catalog falsely represented that the auction was a "complete dispersal sale," meaning that all bidders attending the auction would have a fair opportunity to bid on horses, all bidders would be treated equally, the highest bidder at the auction would prevail as the purchaser, and there would be no reserve.

162.    The auction participants, including Weston, relied on Rose's representations concerning the nature of the auction in deciding to attend the auction, and therefore those representations were material. *See Italian Cowboy Partners v. Prudential Ins.*, 341 S.W.3d 323, 337 (Tex. 2011). In fact, Mr. Brandly explained that there is no more important or material term of an auction than whether it is subject to reserve. The dispersal sale catalog made several references to the auction being a "complete dispersal sale," and witnesses, including Weston, testified that they relied on that representation, which induced them to attend the auction.

163.    Rose herself admitted that she marketed the auction as a "complete dispersal sale" in order to garner good attendance and to obtain the highest possible prices for the horses she planned to sell. This testimony is consistent with Brandly's expert testimony. Brandly testified that a complete dispersal sale label was synonymous with an "absolute auction." Brandly testified that an absolute auction signals that "everything is selling" and the seller is going out of business. The purpose is to "draw far bigger crowds, much more vigorous bidding," and that suggesting that everything is selling is "quite seductive."

164.    A "complete dispersal sale" was consistent with Rose's representations to the Aarons that she intended to get out of the horse business.

165.     The auction participants, including Weston, relied on additional misrepresentations that occurred during the auction.  Weston observed the Aarons' bidding beginning with the first Blue List horse which appeared to sell for $100,000, when, in reality, the Aarons paid only $45,000 for the horse pursuant to the Confidential Term Sheet.  Weston also witnessed and was influenced by the bidding on SHINER NAMED SIOUX, which appeared to sell for $850,000, when, in reality, the Aarons paid only $750,000 for the stallion pursuant to the Confidential Term Sheet. The false bidding on the Blue List Horses were material representations because those representations were important to Weston in making her decision to bid.

166.     Weston also relied on the auctioneers' misrepresentations.  Auctioneers are bound by various standards of practice and rules for auctions, including that the auctioneer "may not knowingly use or permit the use of false bidders at any auction." TEX. ADMIN. CODE §67.70(c)(3). When accepting the Aarons' false bids, with respect to the Blue List Horses, the auctioneers made material misrepresentations to Weston that the bidding above those Blue List Horse prices were legitimate.

167.     Rose hired the announcers and auctioneers and they worked on her behalf.  The Court finds that the auctioneers were agents of Rose that were acting under her actual and apparent authority.

168.     The misrepresentations of the announcers and auctioneers are thus imputed to Rose. *See NationsBank v. Drilling*, 922 S.W.2d 950, 952–53 (Tex. 1996) (discussing apparent authority). Furthermore, Rose's conduct regarding the concealment of the Confidential Term Sheet from the auction attendees, including Weston, was deceptive and itself constitutes fraudulent omission.  *See Ten-Cate v. First Nat'l Bank*, 52 S.W.2d 323, 326 (Tex. App—Fort Worth 1932, no writ); *Douglas*

*v. Neill*, 545 S.W.2d 903, 905–06 (Tex. App.—Texarkana 1977, writ ref'd n.r.e.) (false representation can be established by conduct or concealment).

169.     With respect to materiality, Rose testified that two main parts in a horse transaction are: (1) what horse is being purchased and (2) the purchase price.

170.     Mr. Brandly explained that value is an opinion, and that people who are bidding at auctions, which is a "collaborative effort," gauge value based on what other people are bidding. He explained: "People look across the room. They see what other people are bidding." He testified that there is "no question" that other bidders rely upon the representations of value being made through their bids and that "it's not even debatable" that representations of bids affect the judgement of other bidders.

171.     Mr. Brandly used the $850,000 false bid on SHINER NAMED SIOUX as an example. He opined that the false bid would cause other people to believe that the auctioned horses were worth more than the bidders may have previously thought and that the very next horse that came into the ring would "naturally" be affected by the fact that the prior horse went for more than what many were expecting.

172.     The Court concludes that Weston actually and justifiably relied on Rose's material and false representations concerning the nature of the auction in the dispersal sale catalog as well as the material misrepresentations during the auction, including the false bidding by the Aarons and false representations by the announcers and auctioneers. Weston's bids on the horses she purchased at the auction were influenced Rose's material omissions as well as her material and false representations, and, therefore, the omissions and misrepresentations caused injury to Weston.

173.    The Court, therefore, concludes that Weston established claims for fraud, fraudulent inducement, and fraud by non-disclosure.  Weston's request for an award of her actual damages on account of Rose's fraud, plus pre- and post-judgment interest, is discussed below.

### 4.    Negligence and Negligent Misrepresentation

174.    In order to succeed on a claim of negligence, Weston must prove that: (1) Rose owed a legal duty to Weston; (2) Rose breached the duty; and (3) Rose's breach of the duty proximately caused Weston's injury.  *See Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009).

175.    In order to succeed on a claim of negligent misrepresentation, Weston must prove that: (1) the representation was made by Rose in the course of her business, or in a transaction in which she had a pecuniary interest, (2) Rose supplied 'false information' for the guidance of others in their business, (3) Rose did not exercise reasonable care or competence in obtaining or communicating the information, and (4) Weston suffered pecuniary loss by justifiably relying on the representation.  *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991) (adopting RESTATEMENT (SECOND) OF TORTS § 552 (1977)); *accord McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 792 (Tex. 1999).

176.    Having found Rose is liable for the intentional tort of fraud, the Court finds that addressing the negligence causes of action will not impact the Court's final judgment.  However, certainly under the lower negligence standard, Rose is also liable.

177.    Courts have held that a general duty to disclose information may arise in an arm's-length business transaction even when a party makes a partial disclosure that, although true, conveys a false impression.  *See, e.g., McCarthy v. Wani Venture, A.S.*, 251 S.W.3d 573, 585 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *see also NuVasive, Inc. v. Renaissance Surgical Ctr.*

*North, L.P.*, 853 F.Supp.2d 654, 663 (S.D. Tex. 2012) (holding that a duty to disclose can exist absent a fiduciary relationship, including in an arm's length transaction in which a seller's partial disclosure conveys a false impression).  Further, silence may be equivalent to a false representation when the particular circumstances impose a duty on the party to speak and he deliberately remains silent. *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001).

178.    The Court incorporates its prior findings, which demonstrate that Rose breached these duties owed to the auction attendees, including Weston, regarding communicating the nature of the auction.

### 5.    Texas Theft Liability Act

179.    The Texas Theft Liability Act, TEX. CIV. PRAC. & REM. CODE § 134.001, *et seq.,* provides a private cause of action for many different forms of theft.  To recover for a civil theft under the TTLA, a plaintiff must establish: (1) the plaintiff had a possessory right to property; (2) the defendant unlawfully appropriated property in violation of the theft provisions of the Texas Penal Code; and (3) the plaintiff sustained damages as a result of the theft.  *Wellogix, Inc. v. Accenture, LLP,* 788 F.Supp.2d 523, 542 (S.D. Tex. 2011).  *See* TEX. CIV. PRAC. & REM. CODE §§ 134.002, 134.003; TEX. PEN. CODE § 31.03.

180.    "Appropriate" means to "acquire or otherwise exercise control over property other than real property." TEX. PEN. CODE § 31.01(4).  Appropriation of property is unlawful if (1) it is without the owner's effective consent; [or] (2) the property is stolen and the actor appropriates the property knowing it was stolen by another...." TEX. PENAL CODE § 31.03(a)-(b)

181.    Consent cannot be effective if it was induced by deception.  The Texas Penal Code defines "deception" as:

(A)     creating or confirming by words or conduct a false impression of law or fact, that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true;

(B)     failing to correct a false impression of law or fact, that is likely to affect the judgment of another in the transaction, that the actor previously created or confirmed by words or conduct; and that that the actor does not now believe to be true; or

(C)     preventing another from acquiring information likely to affect her judgment in the transaction.

TEX. PEN. CODE §31.01(1)(A-C); *see also Haler v. Boylington Cap. Grp.*, 411 S.W.3d 631, 636 (Tex. App.—Dallas 2013, pet. denied) (unlawful appropriation element for TTLA claim shown by evidence showing that defendant misrepresented the financial condition of an entity and how plaintiff's funds would be used); *Texas Int. Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 377 (Tex. App.—Dallas 2009, pet. denied) (unlawful appropriation element for TTLA claim shown by evidence that former employee took office equipment and monies for compensation of other employees).

182.     Here, Weston paid $288,075.00 for the purchase of several horses and embryos at the dispersal sale.  Such purchase monies constitute "property" under the TTLA, the appropriation of which by Rose is actionable.  *See* TEX. CIV. PRAC. & REM. Code §§ 134.002, 134.003; TEX. PEN. CODE § 31.03.

183.     Second, the evidence at trial established deception by Rose.  Rose knew the Aarons were making bids they were not obligated to pay with respect to the Blue List Horses.  Rose also knew the prices displayed for the audience on the tote board at the auction were false prices with respect to the Blue List Horses.

184.     Weston relied on these false representations when making decisions and judgments about which horses to bid on and to purchase at the auction.  Weston testified, credibly, that she

relied on the false representations in bidding on her horses, including, but not limited, to SHINERS LENA DOC. When asked: "Had you known the truth about the price or arrangement on a SHINER NAMED SIOUX, would you have even bid on SHINERS LENA DOC?" Weston's answer was clear, unequivocal, and uncontested: "Forget it. No Way." Similarly, when asked if she had known that the Aarons were bidding on some of their own horses, whether she would have bid on any horse, Weston responded clearly – "No."

185.    The Court finds and concludes that Rose's material omissions, false representations, and deception induced Weston to make her purchases, and thereby vitiated any effective consent of Weston to tender purchase monies to Rose. *See* TEX. CIV. PRAC. & REM. CODE §§ 134.002, 134.003; TEX. PEN. CODE §§ 31.01(1)(A-C), 31.03.

186.    Finally, Weston was harmed. Weston testified, and the evidence demonstrated, that in reliance on the various misrepresentations, she spent over $288,000 at the auction that she would not have spent but for the false representations. Weston has requested rescission with respect to the $190,000 she paid for SHINERS LENA DOC, leaving a balance of $98,000 (less the $21,941 the Weston Parties recovered from the horse auction in San Antonio).

187.    Weston requests an award of her actual damages, plus pre- and post-judgment interest, as well as her attorneys' fees under the TTLA. The TTLA provides that "[e]ach person who prevails ... shall be awarded court costs and reasonable and necessary attorney's fees." TEX. CIV. PRAC. & REM. CODE § 134.005(b). Weston's request for damages and her attorneys' fees is discussed below.

188.    In addition, Weston requests exemplary damages of three times the amount of her actual damages as a result of Rose's fraud and violations of the TTLA. While exemplary damages awards are generally limited to two times the amount of economic damages, such limitations do

not apply when a defendant is found to have committed conduct knowingly and intentionally described as a felony in Texas Penal Code.  *See* TEX. CIV. PRAC.& REM. CODE § 41.008(c), (d).

189.     In general, as previously discussed, "exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from: (1) fraud; (2) malice; or (3) gross negligence.  See TEX. CIV. PRAC. & REM. CODE § 41.003(a)-(b).  *See also* T*exaco, Inc. v. Phan*, 137 S.W.3d 763 (Tex. App.—Houston [1st Dist.] 2004, no pet).  The determination of whether to award exemplary damages is within the discretion of the trier of fact.  TEX. CIV. PRAC. & REM. CODE § 41.010.

190.     The following factors are relevant in determining whether an award of  exemplary damages is appropriate against Rose and Rose, Inc. (1) the nature of the wrong; (2) the character of the conduct; (3) the degree of culpability of the Rose Parties; (4) the situation and sensibilities of all parties involved; (5) the extent to which such conduct offends a public sense of justice and propriety; (6) compensation for inconvenience caused by the conduct; and (7) the size of an award needed to deter similar wrongs in the future.  *See* Tex. Pattern Jury Charge 28.7A*; Alamo National Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981); *Hofer v. Lavender*, 679 S.W.2d 470, 474 (Tex. 1984); *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 29–30 (Tex. 1994).

191.     Here, under the clear and convincing evidence standard, the Court concludes that exemplary damages are not warranted.  Rose's misconduct has exposed her to liability, but she did not act maliciously or engage in the sort of extreme misconduct, over and above her fraud and violations of the TTLA, that would support exemplary damages.

### 6.    Conspiracy, Aiding and Abetting

192.    On page 25 of the parties' joint pre-trial order, in a section entitled "The Weston Parties' State Law Claims Against the Rose Parties," Weston asserts a claim against the Rose Parties for "Conspiracy, Aiding and Abetting" in connection with the Weston Parties' request for allowance of their claim.  "Weston contends that Rose should be jointly and severally liable for the actions and torts committed by her co-conspirators, the Aarons, Mr. Stevens, and the Auctioneers."  Weston further contends that "[e]ach of these assisted and encouraged each other before, during, and after the 'Complete Dispersal Sale.'"

193.    Once an underlying tort is established, a civil conspiracy extends liability in tort beyond the active wrongdoer to those who knowingly planned, assisted or encouraged the wrongdoer's acts.  *See Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925-26 (Tex. 1979).  Accordingly, the elements of a civil conspiracy are "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result."  *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005).  An overt act is an outward act done in furtherance of the conspiracy.  *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983).

194.    A concert-of-action theory imposes liability for substantially assisting and encouraging a wrongdoer in a tortious act.  *See Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996).  This is a lesser showing than a civil conspiracy which requires a specific intent and agreement to commit the tortious act.  *See id.*

195.    Courts within Texas recognize two iterations of the theory.  First, as articulated by Prosser and Keeton, liability is imposed for "[a]ll those who, in pursuance of a common plan or design to commit a tortious act, actively take part in, or further it by cooperation or request, or who

lend aid or encouragement to the wrongdoer or ratify and adopt the wrongdoer's acts done for their benefit, are equally liable." *Id.* at 642 (quoting W. Page Keaton et al. PROSSER AND KEETON ON THE LAW OF TORTS § 46, at 323 (5th ed. 1984)). Second, as articulated by the Restatement (Second) of Torts, liability is imposed on a person for conduct of another which causes harm in one of three scenarios: if the person (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person. *See id.*

196.    Here, Weston asserts a conspiracy or concert of action between Rose, the auctioneers, Lewis Stevens, and the Aarons to defraud the auction attendees through the secret use of reserves and the failure to disclose the true ownership of the horses being auctioned. Weston has established that Rose engaged in fraud and violated the TTLA. In addition, Weston seeks to hold Rose liable for any wrongdoing by the Aarons, the auctioneers, and Lewis Stevens in furtherance of the alleged conspiracy. However, according to the parties' joint pre-trial order, Weston has not asked this Court to decide any of her tort claims against the Aarons, the auctioneers or Stevens.

197.    At Rose's request, the Aarons' pre-auction purchase of 39 Blue List Horses was confidential. Rose's attorney, Stevens, assured the Aarons that their pre-auction purchase agreement was ethical and common in the industry.

198.    With respect to the dispersal sale catalog, the Aarons and the auctioneers had no role in its creation or distribution. The Aarons and the auctioneers did not have any authority over Rose's disclosures of the ownership of the various horses in the dispersal sale catalog.

199.    The auctioneers were aware that the Aarons would be bidding on their own horses at the auction, because Rose told them so when she met with them on the morning of the auction. The auctioneers did not know the Aarons and they were unaware of the specific terms of the Confidential Term Sheet.  In particular, Weston did not establish that the auctioneers were aware that Rose required the Aarons to "win" the bidding on the Red List Horses in order to obtain the registration papers or that the auctioneers conspired with Rose so that the Aarons would win the bidding on the Red List Horses.

200.    Stevens reviewed the portion of the proposed catalog that contained notices, special notices, terms and conditions, and he made minor, stylistic changes.  Stevens had no input into or authority over Rose's disclosures relating to the horses in the catalog.  However, Stevens drafted the Confidential Term Sheet signed by Rose and the Aarons, and he was aware that the Aarons would be bidding on the Blue List Horses, which the Aarons had already purchased, and he was aware that the Aarons had to "win" the bidding in order to get the registration papers.  In addition, Stevens helped Rose prepare the auction binders, and he was aware the Rose was placing reserves on nearly all the horses that she planned to auction.

201.    In contrast, the Aarons were unaware of and had no control over Rose's use of reserves during the auction (other than those for the horses on the Blue List, which were not technically "reserves").  The Aarons did not assist in the preparations for the auction, hire the auctioneers or Stevens, or have any authority to direct the auctioneers' communications during the auction.  Further, the Aarons did not arrive until moments before the auction began, and they had no knowledge of any disclosures the auctioneers might have made to the other attendees prior to their arrival.

202.     The Aarons did not benefit from Rose's demand for confidentiality with respect to their pre-auction purchase agreement for the Blue List Horses or from Rose's use of reserves for the balance of the horses offered at the auction.  The Aarons were bidding dollar-for-dollar with other auction attendees on the non-Blue List Horses, and, with respect to the Red List Horses, they were as vulnerable as everyone else to any price distortions caused by Rose's use of reserves and her requirement that the Aarons "win" the Blue List Horses.

203.     The Aarons and Stevens did not share in any of the proceeds Rose received from the auction and never expected to do so.  The two auctioneers received a percentage of the auction sales, which is customary in the industry, and Stevens was paid for his time assisting Rose at the auction at his normal hourly rate.

204.     Even assuming Weston established a tortious act by the Aarons, Stevens, and the auctioneers, the Court concludes that Weston has not established that Rose had a specific intent or agreement to assist them or, specifically, to assist the Aarons in a conspiracy to defraud Weston and the other auction attendees.  The preponderance of the credible evidence establishes that Rose and the Aarons did not have any common purpose and that Rose did not knowingly assist the Aarons in a tortious act.  The Court, therefore, concludes that Weston has failed to establish a claim against the Rose Parties for conspiracy or aiding and abetting.

## 8.     Nondischargeability under 11 U.S.C. § 523(a)(2)(A)

205.     Weston seeks a judgment of non-dischargeability as to her claims against Rose, individually.  Section 523(a)(2)(A) of the Bankruptcy Code provides that the bankruptcy discharge does not apply to a debt owed by an individual debtor "for money, property, services . . . to the extent obtained by false pretenses, a false representation, or actual fraud. . ."   The Fifth Circuit

distinguishes between "false pretenses and false representation" on the one hand, and actual fraud on the other. *RecoverEdge LP v. Pentecost*, 44 F.3d 1284, 1292 (5th Cir. 1995).

### a. False Pretenses or False Representation

206.    First, Weston seeks a non-dischargeable judgment based on false pretenses or false representations.

207.    The elements of false pretenses or false representations are: (1) a knowing and fraudulent falsehood; (2) describing past or current facts; and (3) that was relied upon by the other party. *In re Janney*, 557 B.R. 476, 479 (Bankr. M.D. La. 2016) (citing *RecoverEdge*, 44 F.3d at 1292–93). The creditor's reliance need not be objectively reasonable, just subjectively justifiable. *Field v. Mans*, 516 U.S. 59, 76 (1995).

208.    Here, Rose intentionally concealed the Confidential Term Sheet from the 600 registered bidders at the auction, including Weston. Rose testified that she thought such disclosure would "upset" the auction participants.

209.    The dispersal sale catalog had been printed prior to Rose's deal with the Aarons. Nonetheless, Rose could have informed auction participants of the pre-auction sale of 39 horses to the Aarons at the start of the auction. She did no such thing. Instead, during the auction, Rose stood at the front and watched as the Aarons placed bids on the 39 Blue List Horses that she knew they would not have to pay based on the Confidential Term Sheet.

210.    Rose's concealment of the Confidential Term Sheet was a false representation. Courts, including the Fifth Circuit, have repeatedly held that silence regarding a material fact can constitute a false representation. *In re Selenberg*, 856 F.3d 393, 399 (5th Cir. 2017); *see also Arnette*, 454 B.R. at 698 ("False representations need not be overt. 'When one has a duty to speak, both concealment and silence can constitute fraudulent representation,'" quoting *In re Mercer*, 246

B.R. 391, 404 (5th Cir. 2001)).  In *Selenberg*, the debtor argued that the false representations were not made with intent or purpose to deceive.  The Fifth Circuit noted that "[a]n intent to deceive may be inferred from 'reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation.'"  *Id*. at 400.

211.    In addition to her concealment of the Confidential Term Sheet, Rose and her agents made affirmative misrepresentations to the auction attendees, including Weston, during the auction.  For example, they affirmatively misrepresented that a SHINER NAMED SIOUX sold for $850,000 when, in fact, the Aarons had already paid $750,000 for the stallion.

212.    Rose also affirmatively misrepresented the nature of the auction by calling it a "complete dispersal sale," thereby misrepresenting her intention to use reserves.

213.    Weston justifiably relied on Rose's silence and her affirmative misrepresentations in placing her bids at the auction.

214.    The Court concludes that the auction was conducted under false pretenses and that Rose obtained Weston's money under false pretenses.

215.    Weston requests a non-dischargeable judgment for her actual, direct damages on account of Rose's misrepresentations.  Weston also requests that the non-dischargeable judgment include her attorney's fees (based on her successful TTLA claim) as well as pre- and post-judgment interest.

216.    Weston's request for a non-dischargeable award of damages, plus pre- and post-judgment interest as well as her attorneys' fees, is discussed below.

### b.  Actual Fraud

217.    Alternatively, Weston seeks a non-dischargeable judgment based on Rose's fraud.

218.    The elements of "actual fraud" under § 523(a)(2)(A) generally correspond with the elements of common law fraud in Texas, and include: (1) the debtor made a representation; (2) the debtor knew the representation was false; (3) the representation was made with intent to deceive the creditor; (4) the creditor actually and justifiably relied on the representation; and (5) the creditor sustained a loss as a proximate result.  *In re Mercer*, 246 F.3d 391, 403 (5th Cir. 2001).  S*ee also In re Ritz*, 832 F.3d 560, 565 (5th Cir. 2016) (noting that since *Husky Int'l Elecs., Inc. v. Ritz*, ⸺ U.S. ⸺, 136 S.Ct. 1581, 1586, 194 L.Ed.2d 655 (2016), the term "actual fraud" in section 523(a)(2)(A) encompasses forms of fraud that can be effected without false representation).

219.    The U.S. Supreme Court recently broadened the scope of "actual fraud" in 11 U.S.C. § 523(a)(2)(A).  In *Husky*, the Court commented that "actual" means "moral turpitude or intentional wrong" (in the common-law fraud context), and "fraud" means deception or trickery, though the term is difficult to precisely define. *Id*. at 1586–87.[14] Another bankruptcy court defined actual fraud as "any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another—something said, done or omitted with the design of perpetrating what is known to be a cheat or deception." *In re Janney*, 557 B.R. 476, 480 (Bankr. M.D. La. 2016).

220.    In this case, the Court has already determined that Rose committed fraud and incorporates all of those findings and conclusions here.  Rose made representations to Weston that she knew were false.  Rose intended to deceive Weston and the other auction attendees.  Weston actually and justifiably relied on Rose's misrepresentations and was damaged as a result.

---

[14] Prior to *Husky*, the Fifth Circuit required that a misrepresentation by the debtor was a necessary element of "actual fraud."  The following are the five pre-*Husky* elements for "actual fraud" in the Fifth Circuit: (1) the debtor made representations, (2) at the time they were made the debtor knew they were false, (3) the debtor made representations with the intention and purpose to deceive the creditor, (4) that the creditor relied on such representations, and (5) that the creditor sustained losses as a proximate result of the representations. *In re Selenberg*, 856 F.3d 393, 398 (5th Cir. 2017).

221.    For purposes of § 523(a)(2)(A), Weston's damages on account of Rose's fraud are coextensive with Weston's damages arising from Rose's violations of the TTLA.

222.    Weston requests a non-dischargeable judgment awarding her actual, direct damages on account of Rose's fraud.  Weston's request for an award of damages, plus interest and her attorneys' fees, is discussed below.

### 9.    Damages and Attorneys' Fees

223.    Weston requests an award of actual, direct damages against Rose and Rose, Inc. on account of Rose's fraud and misrepresentations, as well as her violations of the TTLA, in the following amounts: pre-auction damages of $4,557.94, auction damages of $288,075.02, and post-auction damages of $181,325.18.  Weston also requests pre- and post-judgment interest as well as her attorneys' fees.

### a.    Pre-Auction Damages – $4,557.94

224.    Weston testified and produced additional evidence that she incurred $4,557.94 in out-of-pocket damages prior to attending the auction in reliance on the representations made by Rose.  But for Rose's representations about the nature of the dispersal sale, none of these expenditures would have been made.  The Court finds that these constitute direct out-of-pocket damages that were the necessary and usual result of the Rose Parties' conduct as described herein.

### b.    Auction Damages – $288,075.00

225.    Weston incurred $288,075.00 in out-of-pocket damages while at the auction in reliance on the representations made by Rose.  Weston testified that none of these out-of-pocket amounts would have been spent but for the representations made before and during the auction, including the advertising, the dispersal sale catalog, the admitted false bidding by the Aarons, and

other false representations made by Rose's announcers and auctioneers. The Court finds that these constitute direct damages that were the necessary and usual result of Rose's conduct.

### c.      Post-Auction Damages – $181,325.18

226.    After the auction, Rose sent Weston monthly invoices for the care, boarding, and expenses associated with the horses Weston had purchased at the dispersal sale. The total amount of the invoices was $181,325.18 from the date of the dispersal sale until the horses (with the exception of SHINERS LENA DOC) were sold at an auction in San Antonio.

227.    Equis Equine has filed a claim for the amounts it paid Rose on account of the invoices Rose sent to Weston. Rose objects to the standing of Equis Equine to seek damages. Rose argues that Equis Equine could not have been injured by Rose's conduct, because Weston did not form Equis Equine and transfer the horses to it until after the auction. However, Rose sent monthly bills to Weston, not Equis Equine, and Weston has standing to seek damages.

228.    The Court finds that the means used to allocate expenses to the Rose horses was reasonable and conservative. The Court finds that these constitute direct damages that were the necessary and usual result of Rose's conduct as described herein. In addition, the Court finds that as a result of reasonable mitigation efforts, this amount should be reduced by $36,040, which represents the sale proceeds for the Rose horses (with the exception of SHINERS LENA DOC).

### d.      Weston's Mitigation

229.    Weston sold all but one of the horses she purchased at Rose's dispersal sale at a reputable sale in San Antonio. Weston has credited those amounts to Rose in her total calculation of damages. The Court finds that there was no evidence suggesting that the San Antonio sale was not a reasonable sale or that such mitigation was not reasonable. The Court further finds, as

described above, that the damage calculations above accounted for the reasonable mitigation efforts by the Weston Parties.

### e.      SHINERS LENA DOC and Rescission

230.     Weston has been unable to sell SHINERS LENA DOC and has requested that Rose return the purchase price of $190,000 for Lena Doc in exchange for returning the stallion to Rose. Weston and Rose both testified that Weston had requested her money back and to return Lena Doc in 2014 but that Rose refused.  The Court further finds that the special equitable considerations as described herein and because of fraudulent conduct, justify the imposition of the equitable remedy of rescission in this case as to SHINERS LENA DOC.  The rescission amount of $190,000 is included in the Auction damages above.

### f.      Pre- and Post-Judgment Interest

231.     As previously discussed, Weston established actual, direct damages in the total amount of $437,918.12.

232.     Weston requests an award of pre-judgment interest.  Because no federal statute sets the pre-judgment interest rate, the Court looks to state law.  *See, e.g., In re Ritz*, 567 B.R. 715, 769 (Bankr. S.D. Tex. 2017).  Under Texas law, an equitable award of prejudgment interest should be granted to a prevailing party in all but exceptional circumstances.  *Huggins v. Royalty Clearinghouse, Ltd.*, 121 F. Supp. 3d 646, 660 (W.D. Tex. 2015).  Moreover, the Supreme Court has held that § 523(a)(2)(A) should not be construed in favor of "giving perpetrators of fraud a fresh start over the interest in protecting victims of fraud."  *Cohen v. de la Cruz*, 523 U.S. at 213 (internal citation and quotation omitted).

233.     In Texas, the rate of pre-judgment interest "accrue[s] at the same rate as post-judgment interest."  *Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines*, 278 F.3d 494, 500 (5th

Cir. 2002). The post-judgment rate is statutorily set at the "prime rate as published by the Board of Governors of the Federal Reserve System on the date of computation." TEX. FIN. CODE § 304.003(c)(1). The current prime rate is 5.0%. *Selected Interest Rates (Daily)—H.15,* BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYS. (September 26, 2018), https://www.federalreserve.gov/releases/h15/. Section 304.003(c)(2) of the Texas Finance Code states that the judgment rate shall be set at 5.0% if the current prime rate is less than 5.0%. Therefore, based on the evidence presented, the Court finds that Elizabeth Weston is entitled to pre-judgment interest on her damages at the rate of 5% per annum.

234.    An award of pre-judgment interest will accrue from the "time demand is made or an adversary proceeding is instituted." *Floyd v. Dunson (In re Rodriguez)*, 209 B.R. 424, 434 (Bankr. S.D. Tex. 1997). Therefore, here, the Court finds that the pre-judgment interest rate of 5.0% accrues as of the date of Weston's initiation of a lawsuit against the Rose Parties (among others) — *i.e.*, August 7, 2015. Thus, the total amount of this pre-judgment interest is $68,807.13.

235.    Weston also requests an award of post-judgment interest. 28 U.S.C. § 1961(a) sets forth that interests "shall be allowed on any money judgment in a civil case recovered in a district court." This statute also "applies to judgments entered by a bankruptcy court." *Ocasek v. Manville Corp. Asbestos Disease Comp. Fund*, 956 F.2d 152, 154 (7th Cir. 1992). Further, the statute sets forth that the interest will be at the rate of the "weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(a).

236.    For the week of September 24 to September 30, 2017, the post-judgment interest rate for federal judgments is 2.58% per annum. Accordingly, the Court will grant Weston's request for post-judgment interest and will impose a rate of 2.58% per annum. *See, e.g., In re Haler*, 2016

WL 825668, at *14–15 (Bankr. E.D. Tex. Mar. 2, 2016) (awarding post-judgment interest on debts that were declared non-dischargeable pursuant to § 523(a)(2)(A)).

### g.    Weston's Attorneys' Fees

237.    As previously discussed, the TTLA provides that the prevailing party "shall" be awarded reasonable and necessary attorneys' fees. *See* TEX. CIV. PRAC. & REM. CODE 134.045(b). The amount of the reasonable and necessary attorney's fees relating to her TTLA claim will be determined following a separate hearing.

### h.    Non-Dischargeability of Damages

238.    With regard to attorney's fees and accrued interest in the context of determining the dischargeability of a particular debt, "the status of ancillary obligations such as attorney's fees and interest depends on that of the primary debt.  When the primary debt is nondischargeable ..., the attorney's fees and interest accompanying compensatory damages, including post-judgment interest, are likewise nondischargeable." *Gober v. Terra + Corp. (In re Gober),* 100 F.3d 1195, 1208 (5th Cir. 1996); *see also Cohen,* 523 U.S. at 218.

239.    Here, Rose obtained money from Weston at the auction and after the auction as a result of her misrepresentations and fraud.  All of Weston's damages, including any attorneys' fees that may be awarded, are debts that arise from the fraud and are non-dischargeable. *See Cohen v. de la Cruz*, 523 U.S. 213, 223 (1998) (the § 523(a)(2)(A) exception to discharge "encompasses any liability arising from money, property, etc., that is fraudulently obtained."); *see also In re Denbleyker*, 251 B.R. 891, 898–99 (Bankr. D. Colo. 2000) (holding that "*Cohen* implies that § 523(a)(2)(A) prevents the discharge of all liabilities arising from a debtor's fraud, regardless of whether the plaintiff proves that the debtor benefitted in any way"); *In re Munoz*, 536 B.R. 879, 883 (Bankr. D. Colo. 2015); *In re Davis*, 377 B.R. 827 (Bankr. E.D. Tex. 2007) (holding that

attorney's fees and actual, exemplary, and other damages were non-dischargeable under § 523(a)(2) and (a)(6)).

### F.     Rose's Objections to Weston's Claims

240.     Weston and Equis Equine timely filed proofs of claim numbers 7 and 8 in the Rose bankruptcy case and claim numbers 2 and 3 in the Rose, Inc. case.  The Weston and Equis Equine proofs of claim included a complete Official Form B-10, an addendum that explained the claims set forth in the Weston Action in state court, and the original petition in the state court was attached to their proofs of claim.

241.     Weston has proven the following claims against Rose (1) liability under Texas Business and Commerce Code § 2-328; (2) common-law fraud, fraudulent inducement, and fraud by non-disclosure; (3) negligence and negligent misrepresentation; and (4) liability under the Texas Theft Liability Act.  Weston has proven actual damages in the amount $437,938.12.

242.     Carol Rose was the president and sole owner of Carol Rose, Inc.  She dominated its operations and even lived on the property owned by Carol Rose, Inc., where she did business as Carol Rose Quarter Horses.  Thus, the Court determines that Carol Rose and Carol Rose, Inc. are jointly and severally liable to Weston for these amounts.

243.     The Court will hold a subsequent hearing to determine the amount of Weston's reasonable attorneys' fees, which are in addition to the actual damages.  The Court will determine the amount of pre-judgment interest at the time of a final judgment.

244.     All of these amounts shall be considered "allowed" claims in the Rose Parties' bankruptcy cases.  Weston has also proven that these amounts are nondischargeable as to Rose, individually, under § 523(a)(2)(A) under the Bankruptcy Code.

### G.      Weston's Claims for Equitable Subordination Against Rose and the Aarons

245.      The parties agreed to a bench trial on certain expressly enumerated claims.  The agreed claims did not include Weston's state-law claims against the Aarons.  Weston's claims against the Aarons were reserved and carved out of the trial.

246.      However, on page 67 of the parties' joint pre-trial order, Weston seeks to equitably subordinate any allowed claim of the Aarons to her allowed claim based on "alleged inequitable conduct by the Rose Parties and the Aaron Parties," which "resulted in injury to the Weston Parties."  Weston also seeks to equitably subordinate any allowed claim of the Rose Parties to her bankruptcy claim based on fraud, conspiracy, and aiding and abetting.

247.      The doctrine of equitable subordination, codified in 11 U.S.C. § 510(c), developed under the common law as a policy against fraud and the breach of the duties imposed on a fiduciary of the bankrupt.  *See Pepper v. Litton*, 308 U.S. 295, 311 (1939).  The doctrine is designed "to undo or to offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results."  *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 411 (3rd Cir. 2009).

248.      The elements of equitable subordination have been articulated in the Fifth Circuit as follows: (1) the claimant must have engaged in inequitable conduct; (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage to the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code.  *Wooley v. Faulkner (In re SI Restructuring, Inc.),* 532 F.3d 355, 360 (5th Cir. 2008).  If any of these elements are not satisfied, equitable subordination is inappropriate.  *Id.; see also Benjamin v. Diamond (In re Mobile Steel Co.),* 563 F.2d 692, 706 (5th Cir. 1977) (denying subordination

because there was "no factual showing that any of these purported improprieties injured either Mobile Steel or its creditors").

249.     The Fifth Circuit has recognized three general categories of misconduct which may constitute inequitable conduct justifying equitable subordination of a claim: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) the claimant's use of the debtor as a mere instrumentality or alter ego. *Wilson v. Huffman* (*Missionary Baptist Foundation of Amer., Inc.),* 712 F.2d 206, 212 (5th Cir. 1983).  In *Mobile Steel*, the Fifth Circuit quoted with approval the following passage from a pre-Bankruptcy Code case:

> The inequity which will entitle a bankruptcy court to regulate the distribution to a creditor, by subordination or other equitable means, need not therefore be specifically related to the creditor's claim, either in its origin or in its acquisition, but it may equally arise out of any unfair act on the part of the creditor, which affects the bankruptcy results to other creditors and so makes it inequitable that he should assert a parity with them in the distribution of the estate.

563 F.2d at 700 (quoting *In re Kansas City Journal-Post Co.,* 144 F.2d 791, 803-04 (8th Cir. 1944)).

250.     Here, in light of this Court's findings discussed in the conspiracy count against Rose, the Court concludes that Weston has failed to establish grounds to equitably subordinate the Aaron Parties' allowed claim to her claim.

251.     With respect to the Rose Parties, Rose, Inc. scheduled a $1,589,623 claim for Carol Rose (individually) and did not mark the scheduled claim as contingent, disputed, or liquidated. Rose, Inc.'s scheduling of the $1,589,623 claim for Carol Rose has the same force and effect as if Carol Rose had filed a proof of claim for that amount.  *See* 11 U.S.C. 1111(a); FED. R. BANKR. P. 3003(b)(1).

252.     In light of this Court's conclusion that Weston established claims for fraud, fraudulent inducement, and fraud by non-disclosure against Carol Rose, the Court concludes that

grounds exist to equitably subordinate Carol Rose's allowed claim in the Rose, Inc. bankruptcy case to the Weston Parties' allowed claim under § 510(c) of the Bankruptcy Code.

## IV. CONCLUSION

The Court will enter separate orders consistent with this amended Memorandum Opinion. For the sake of clarity, the Court will enter separate orders for each of the two adversary proceedings (and associated claim objections) addressed by this amended Memorandum Opinion.

Signed on 9/27/2019

*Brenda T. Rhoades*    SR

HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE